# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

|  |  |
|---|---|
| EARL C. JEFFERSON, II, | CASE NO. 1:24-cv-00729 |
| Petitioner, | JUDGE DONALD C. NUGENT |
| vs. | MAGISTRATE JUDGE AMANDA M. KNAPP |
| WARDEN KENNETH BLACK, |  |
| Respondent. | **REPORT AND RECOMMENDATION** |

Petitioner Earl C. Jefferson, II ("Petitioner" or "Mr. Jefferson") brings this habeas corpus petition pursuant to 28 U.S.C. § 2254, asserting six grounds for relief relating to his conviction for offenses that include aggravated murder and sentences that include life in prison without parole in Richland County Court of Common Pleas Case No. 2020 CR 0775 R.  (ECF Doc. 1 ("Petition"), ECF Doc. 9-1, pp. 52-56.)  He filed his pro se Petition on April 12, 2024.[1]  (ECF Doc. 1.)  The matter was assigned to the undersigned Magistrate Judge for a report and recommended decision.  (ECF Doc. 3.)

The case is briefed and ripe for disposition.  (ECF Docs. 9, 13 & 14.)  Also pending before the Court is Petitioner's February 23, 2026 motion for appointment of counsel.  (ECF Doc. 16.)  For the reasons below, the undersigned **DENIES** Petitioner's motion for appointment of counsel (ECF Doc. 16) and recommends that the Court **DENY** and/or **DISMISS** the Petition

---

[1]  Under the mailbox rule, the filing date for a pro se petition is the date that a petitioner delivers it to prison authorities.  *See Houston v. Lack*, 487 U.S. 266 (1988).  The Petition was filed in this Court on April 22, 2024.  But Petitioner states that he placed it in the prison mailing system on April 12, 2024. (ECF Doc. 1, p. 15.)

1

(ECF Doc. 1) because Grounds One through Three are without merit, Grounds Four and Six are not cognizable on federal habeas review and/or are without merit, and Ground Five is procedurally defaulted.

## I. Motion for Appointment of Counsel

Petitioner requests appointment of counsel, arguing that his case involves complex constitutional issues, the record is voluminous, the legal issues are sophisticated, Petitioner lacks the legal training and resources necessary to adequately present and litigate his claims, and the appointment of counsel would assist him and the Court. (ECF Doc. 16.)

There is no constitutional right to counsel in a habeas corpus proceeding. *See United States v. Augustin*, 16 F.4th 227, 233 (6th Cir. 2021), *cert. denied*, 142 S. Ct. 1458 (2022) ("[U]nlike criminal proceedings, there is generally 'no right to counsel in postconviction proceedings.'") (citations omitted); *Cobas v. Burgess*, 306 F.3d 441, 444 (6th Cir. 2002) ("[A] petitioner does not have a right to assistance of counsel on a habeas appeal[.]") (citation omitted). In habeas proceedings such as this, the court has discretion to appoint counsel only where "the interests of justice or due process so require." *Mira v. Marshall*, 806 F.2d 636, 638 (6th Cir. 1986) (citations omitted); see 18 U.S.C. § 3006A(a)(2)(B) ("Whenever the United States magistrate judge or the court determines that the interests of justice so require, representation may be provided for any financially eligible person who . . . is seeking relief under section 2241, 2254, or 2255 of title 28[.]"). This standard "'contemplates a peculiarly context-specific inquiry.'" *Augustin*, 16 F.4th at 233-34 (citation omitted).

In determining whether appointment of counsel is required by due process or the interests of justice, courts "should consider the legal complexity of the case, the factual complexity of the case, and the petitioner's ability to investigate and present his claims, along with any other

2

relevant factors." *Id*. at 234 (quoting *Wiseman v. Wachendorf*, 984 F.3d 649, 655 (8th Cir. 2021) (citation omitted)).  Where a pro se prisoner seeks appointment of counsel, courts have found that "exceptional circumstances" are necessary to justify such relief, like "where a petitioner has made a colorable claim, but lacks the means to adequately investigate, prepare, or present the claim." *Rogers v. Skipper*, 811 F. App'x 986 (6th Cir. 2020).  Conversely, appointment of counsel has been found "unnecessary where claims are 'relatively straightforward' and arise under settled law." *United States v. Pullen*, No. 4:08-CR-431, 2012 WL 116035, at *1 (N.D. Ohio Jan. 13, 2012) (citing *Bookstore v. Addison*, 51 F. App'x 284, 286 (10th Cir. 2002)).

Here, Mr. Jefferson seeks appointment of counsel after: requesting and being granted a control number (ECF Doc. 6; Non-Document Order dated August 1, 2024); successfully arguing for expansion of the record to include additional exhibits (ECF Doc 12; ECF Doc. 15); and filing his Traverse (ECF Doc. 13).  Mr. Jefferson's filings have been organized with coherent arguments, including citations to legal authority and exhibits.  (ECF Docs. 1, 6, 12, & 13.)  These filings do not support a finding that he is unable to present his claims without the assistance of counsel.  Additionally, the Court does not find that this case involves unusually complex facts or unsettled legal issues.  Finally, Petitioner has presented no evidence or argument to support a finding that "exceptional circumstances" warrant the appointment of counsel in this habeas case.  Accordingly, Petitioner's motion for appointment of counsel (ECF Doc. 16) is **DENIED**.

## II.     Factual Background

"In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct."  28 U.S.C. § 2254(e)(1).  The petitioner has the

3

burden of rebutting that presumption by clear and convincing evidence.  *See id.*; *Railey v. Webb*,

540 F.3d 393, 397 (6th Cir. 2008).

The Fifth District Court of Appeals summarized the facts underlying Mr. Jefferson's

conviction and sentence as follows:

{¶1} On January 7, 2021, the Richland County Grand Jury indicted appellant on one count of aggravated murder in violation of R.C. 2903.01(A) and 2929.02(A), an unclassified felony, one count of aggravated murder in violation of R.C. 2903.01 and 2929.02(A), an unclassified felony, two counts of aggravated burglary in violation of R.C. 2911.11(A)(1) and 2911.11(B), felonies of the first degree, one count of murder in violation of R.C. 2903.02(A), 2903.02(D) and 2929.02(B), an unclassified felony, and one count of attempted murder in violation of R.C. 2923.02/2903.02(A), R.C. 2903.02(D) and R.C. 2929.02(B), a felony of the first degree. Appellant also was indicted on two counts of felonious assault in violation of R.C. 2903.11(A)(2) and 2903.11(D)(1)(a), a felonies of the second degree, one count of felonious assault in violation of R.C. 2903.11(A)(1) and 2903.11(D)(1)(a), a felony of the second degree, one count of tampering with evidence in violation of R.C. 2921.12(A)(1), a felony of the third degree, one count of domestic violence in violation of R.C. 2919.25(A) and 2919.25(D)(2), a misdemeanor of the first degree and one count of tampering with evidence in violation of R.C. 2921.12(A)(1) and (2) and R.C. 2921.12(B), a felony of the third degree. The indictment also contained ten firearm specifications,

{¶3} At his arraignment on February 3, 2021, appellant entered a plea of not guilty to the charges. Pursuant to a Judgment Entry filed on October 15, 2021, one of the charges of tampering with evidence was dismissed upon appellee's motion.

{¶4} A jury trial commenced on October 11, 2021. The following testimony was adduced at trial.

{¶5} Shaylee Wade testified that she had four children with appellant and that she had been in a relationship with him for 16 years. Appellant lived with Wade and the children. Wade testified that during the early morning hours of November 26, 2020, she and Dwayne Nabors were shot by appellant while they were trying to leave a hotel room.

{¶6} Wade testified that she was 14 years old when she first got together with appellant and that he was 27 at the time. At the time of the shooting, she was 29 and appellant was 43 years old. She described her relationship with appellant as "toxic" and testified that "it was hell, ..." Trial Transcript at 257. She had their first child when she was 16 years old. Wade testified that she was the breadwinner in the family and had gotten her nursing license. Appellant would sometimes watch the children while she was working or going to school, but most of the time he would leave with his friends or cousins and "do his own thing pretty much." Trial

4

Transcript at 258. The children were often left at the home of appellant's parents or the couple's oldest child would watch them. Wade testified that she tried to split up with appellant several times and had asked him to leave, but that appellant's name was on the lease so he never really left.

{¶7} There was testimony that five or six years before the shooting, Wade started sleeping upstairs in her daughter's bed. They lived in the same house, but led separate lives. She testified that about a month before the shooting, she caught appellant in a park with an 18 year old after tracking her car, which had been used by appellant, to the park via an OnStar app on her phone. Appellant ran away and did not stay, but the girl told Wade that she had been with appellant the day before as well and laughed in Wade's face.

{¶8} Wade testified that she met Dwyane Nabors on Facebook and that she thought that they had mutual friends. Close to two months before the shooting, Nabors tried to get Wade to visit him in New Jersey where he was working. Wade told him that she could not visit him there because of her children. They were trying to see each other prior to the shooting and would often text. The first time that the two spoke or met face to face was on November 25, 2020. She described him as "very laid back, very positive" and a "caring" person. Trial Transcript at 268.

{¶9} On the evening of November 25, 2020, Wade was preparing for Thanksgiving. Wade indicated to appellant and her children that she needed to go to the store to grab a few items. She did not take her phone with her because appellant had taken her phone that day. She testified that appellant would look though her phone. Wade took her daughter's phone with her because she was planning on meeting with Nabors and needed a phone. She met Nabors at his business and the two arranged to get a motel room together. Wade went to the motel and checked into room 131 at around 8:30 p.m. She then called Nabors and told him that she was there and called her oldest daughter and told her that she was with one of her friends and would be home later. At the motel, Wade and Nabors talked, drank liquor, and eventually had sex. She testified maybe a year before, she had had intercourse with someone else before.

{¶10} At around midnight, the two were leaving the motel. Wade testified that earlier, at around 10:30 p.m., her phone, which was in appellant's possession, called Nabor's phone. Nabors looked at his phone and saw Wade's picture. When Nabors answered the phone and said hello, no one on the other end of the line spoke and then the call ended. Wade testified that she did not have any suspicions that appellant was looking for her because they were both doing their own thing at the time and in her mind, the relationship had been over for years.

{¶11} When the two exited the motel room, Nabors was in front of Wade. When Nabors opened the door to leave, Wade heard multiple shots. She testified that Nabors put his hands up and said "whoa" twice. Trial Transcript at 285. Nabors then fell over and appellant came into the room and started shooting her. Appellant was not saying anything at the time. Wade testified that Nabors was trying to crawl

5

over to her. After being shot multiple times by appellant, Wade asked him to stop but he would not. She then mentioned their children several times and appellant said "Look what you made me do." Trial Transcript at 286. Wade testified that she saw appellant shoot Nabors in the back of the head while Nabors was on the ground. Before leaving the room, appellant said that he was going to kill himself.

{¶12} Wade testified that she then crawled over to the phone in the room, but that all she heard was beeping because it was unplugged. She called 911 using Nabors's phone. Wade testified that she had nine wounds and had been shot one time in her left knee, three times in her groin area, four times in her abdomen, and once in her buttocks. She had to have a colostomy bag and had to have a hysterectomy. She then had surgery to repair her colon and remove the bag. In all, Wade was in the hospital for 21 days. On the day of her discharge from the hospital, one of the bullets in her left side had worked its way out and had to be cut out. Nabors died as a result of his injuries. Wade testified that neither she nor Nabors had a gun on their person.

{¶13} Officer Thayne Telquist, who is with the Mansfield Police Department, testified that he responded to the scene. He testified that the door to the room was open and that he observed Wade laying across the threshold of the door holding her stomach and bleeding. There was a lot of blood. He also observed an unresponsive man in the room. When he asked Wade who had shot her, she said that the shooter was appellant. She indicated that he was the father of her children and gave out appellant's address. Officer Telquist testified that he found a couple of shell casings south of the door on the right hand side. He further testified that tires had been slashed on a white vehicle and a pickup truck in the parking lot. The vehicles belonged to Wade and Nabors.

{¶14} Larry Schacherer testified that he was a Detective with the Mansfield Police Department and was at the station when appellant turned himself in later in the day. He testified that appellant was "upset, crying, nervous." Trial Transcript at 400. He further testified that he assisted Detective J. Mark Perry in getting a gunshot residue kit from appellant.

{¶15} George Edward Staley, Jr. who is with the Ohio Bureau of Criminal Investigation, testified that he photographed and examined the scene. He testified that he found numerous shell casings inside and outside the motel room and numerous shell fragments inside the room. He testified that Nabors had keys clenched in his hand and that the phone was on the floor. There was testimony at trial that Nabors's ca[u]se of death was multiple gunshot wounds. According to forensic Pathologist Bryan Casto, Nabors was shot in the back of the head, the left upper lip area, the back of his left forearm, in the front of his right forearm, in the left side of his abdomen, and once in each thigh.

{¶16} Detective J. Mark Perry of the Mansfield Police Department testified that he was the lead investigator for the incident. He testified that six shell casings were collected and that while three were outside on the sidewalk outside the door, the others were within the motel room. There were no weapons at the crime scene and

6

the tires were slashed on both Nabors's and Wade's vehicles. As part of his investigation, Perry also reviewed the surveillance video provided by the motel. He testified that appellant was first shown on the video at 12:49 a.m. on November 26, 2020. Appellant went out of camera view and then showed up on the other side near room 131. He further testified that the video showed a Chevy Cruz driven by appellant driving into the motel's parking area at 12:44 a.m. on November 26, 2020. Appellant was observed parking next to Wade's vehicle and attempting to peer into room 131. He then walked back to Wade's car.

{¶17} Perry testified that appellant then left the motel facility at approximately 12:52 a.m. on November 26, 2020 and came back to the motel facility at 1:00 a.m. At approximately 1:02 a.m., appellant walked around Wade's car and slashed her tires and about four minutes later, slashed Nabors's tires. At 1:04 a.m., appellant appeared back in front of room 131 again and was still in front of the room at 1:30 a.m. Appellant began shooting outside the room at 1:32 a.m. and 48 seconds and was inside the room at 1:32 a.m. and 50 seconds. Appellant then exited the room at 1:35 a.m. and 28 seconds and then went right back in at 1:35 a.m. and 32 seconds. Appellant fled southwest to the back of the building and left in the Chevy Cruz at 1:36. a.m. In total, appellant was on the motel property for 8 minutes and 32 seconds before the shooting and a total of 40 minutes from the time that he arrived until he arrived the second time. Between 1:00 a.m. and 1:36 a.m., no car other than the Chevy Cruz came in or out of the motel property.

{¶18} Appellant testified at trial that on the evening of November 25, 2020, he started worrying about Wade after he realized that the store was closed and went out to look for her. He testified that he used GPS to find out where her car was located and then went to the motel using a borrowed car since Wade had taken the only family vehicle. Appellant testified that he probably had a gun with him because he always carried a gun. He testified that he saw Wade's car, walked around the parking lot, and then slashed the tires on her car and the tires on a white truck. He then went to the door of the motel room and sat at the door while listening. Appellant testified that he heard Wade having sex. The following testimony was adduced when he was asked what happened next:

{¶19} A. I don't know. It was like the door opened and I didn't know who it was until the door opened. Then all I remember is him stepping back, saying, "Hey, hey, hey, he got it." He was smiling and laughing. Then I looked at Shaylee, and she was looking at him and she was smiling. And I just, I don't know. I just lost control.

{¶20} Q. Do you remember calling the front desk?

{¶21} A. Yes.

{¶22} Q. Why did you call the front desk?

{¶23} A. Because I wanted to get help.

{¶24} Q. Did you -- what did you do next?

7

{¶25} A. After I made the phone call to the front desk, I was talking to Shaylee for a little bit. Then I waited until I heard sirens. I waited until I knew help was on the way, and I told her I was about to go kill myself. And that's why I left.

{¶26} Trial Transcript at 614. He testified that he loved Wade unconditionally and that most of their fights were from her cheating. Appellant testified that they were going to get married.

{¶27} On cross-examination, appellant admitted that after verifying Wade's location at the motel, he left for eight minutes to try to cool off. He then returned to the motel at 1:00 a.m. and did not leave the property until 1:36 a.m. after calling for help. Appellant testified that after slashing the tires, he could have left and gone home but went and stood outside room 131 for over 25 minutes. According to him, he "could not tear myself from the scene." Trial Transcript at 636. Appellant testified that when the motel room door opened, Nabors jumped towards him and he was scared and fired the first shot and then "just lost it." Trial Transcript at 637. He testified that he never aimed at Wade, but that she was shot because when he was shooting at Nabors, they were right in front of each other. Appellant denied shooting Nabors in the back of the head while Nabors was laying on the ground. Appellant admitted that he called the front desk and asked them to call 911 to get help and then fled. He did not dispute that he shot Nabors seven times or that he shot him in the face or the back of the head or that he shot Wade four to five times. He claimed that he did not aim at Wade. Appellant turned himself in almost 14 hours later after driving around and thinking about what had happened. He testified that he threw his gun, a .40 caliber handgun, in a dumpster. The gun was never recovered. Appellant testified that he "wasn't in [his] right mind" and had "no control over myself that day." Trial Transcript at 650.

{¶28} Bureau of Criminal Investigation Agent Ted Manasian analyzed the gunshot residue test. He testified that particles that are characteristic of gunshot residue were identified on the samples taken from appellant. Trial Transcript at 462-463.

{¶29} Wade's personal cell phone, which had been in appellant's possession on the evening of November 25, 2020, was not returned by appellant and was never located.

{¶30} At the conclusion of the evidence and the end of deliberations, the jury, on October 18, 2021, found appellant guilty of all counts except the attempted murder of Wade. Appellant was sentenced on October 18, 2021.

*State v. Jefferson*, 2022-Ohio-3448, 2022 WL 4545848, at *1-4 (Ohio App. Ct. Sept. 29, 2022);

(ECF Doc. 9-1, pp. 115-23.)

8

### III.    Procedural Background

A.    **State Court Conviction**

On January 7, 2021, a Richland County Grand Jury indicted Mr. Jefferson on two counts of aggravated murder (Counts 1 and 2), two counts of aggravated burglary (Counts 3 and 4), one count of murder (Count 5), one count of attempted murder (Count 6), four counts of felonious assault (Counts 7, 8, 9 and 10), two counts of tampering with evidence (Counts 11 and 13), and one count of domestic violence (Count 12).  (ECF Doc. 9-1, pp. 5-11.)  Counts 1 through 10 included firearm specifications.  (*Id*. at pp. 5-8, 10.)  Mr. Jefferson pled not guilty to all counts through counsel at his arraignment on February 3, 2021.  (*Id*. at p. 12.)

On October 6, 2021, prior to the jury trial scheduled for October 11, 2021 (*id.* at pp. 247-50), Mr. Jefferson filed a motion to appoint a forensic psychologist at court expense (*id*. at pp. 13-16).  In the motion, counsel asserted that "Mr. Jefferson ha[d] exhibited behaviors, as reflected in Discovery documents . . . that could only be viewed as showing a very limited understanding of the judicial system and how he could assist counsel in his own defense" and "raise[d] the question of Mr. Jefferson's mental state at the time of the incident and his ability to comprehend his own personal actions in the instant case."  (*Id*. at p. 14.)  Counsel also reported that "Mr. Jefferson ha[d] exhibited a basic lack of understanding as to the consequences of his actions and the lack of regard for his own personal safety and of others."  (*Id*.)  Citing to state statutory provisions regarding the evaluation of a defendant's present mental condition and his mental condition at the time of the offense charged, counsel requested that a "competency evaluation be ordered in [the] case."  (*Id*. at pp. 14-15.)

The State filed an objection and requested that the court deny the request for appointment of a forensic psychologist.  (*Id*. at pp. 17-22.)  The State argued that it was not clear whether Mr.

9

Jefferson was seeking the appointment of a forensic psychologist to evaluate his competency or to determine his sanity at the time of the offense, but asserted that the motion should be denied either way because it was untimely, without basis, and not properly pled. (*Id*. at pp. 17-21.) If the court construed the motion as a request for the court to evaluate Mr. Jefferson's sanity at the time of the offense, the State argued the court should deny the motion. (*Id*. at p. 21.) Alternately, if the court construed the motion as a request for an evaluation of Mr. Jefferson's present competency, the State argued the court should schedule a hearing to further assess the request. (*Id*.)

On October 7, 2021, the trial court denied the motion to the extent it sought a forensic evaluation as to Mr. Jefferson's sanity because the request was untimely and not in writing. (*Id*. at pp. 23-24.) To the extent Mr. Jefferson was seeking a forensic examination as to competency, the trial court set the matter for a hearing the next day—October 8— "to determine if an examination as to the defendant's competency [wa]s really necessary." (*Id*. at p. 24.) At the hearing, "[t]he court questioned the defendant at length regarding his educational background, mental health status, his criminal history, his criminal charges, the possible penalties, the date and location of the alleged offense, the alleged victims, his not guilty plea and his desire to proceed to trial." (*Id*. at p. 25.) The court considered the State's exhibits along with "the dialog . . . the court had with the defendant during the hearing," and found that the "information provided to the court [did] not overcome the presumption that the defendant [wa]s competent." (*Id*. at pp. 25-26.) The court also found that: Mr. Jefferson "failed to establish that he [wa]s incapable of understanding the nature and objective of the proceedings against him or that he[wa]s unable to assist in his own defense"; "a forensic exam [wa]s not necessary or warranted"; and Mr. Jefferson was "competent to stand trial based on the information before the court." (*Id*.)

10

The case proceeded to a jury trial, which started on October 11, 2021, and continued on October 12, 14, 15, and 18.  (*Id*. at p. 51.)  On October 15, 2021, the trial court granted the State's motion to dismiss one of the two tampering with evidence counts, Count 13.  (*Id*. at pp. 27-29.)  On October 18, 2021, the jury returned verdicts finding Mr. Jefferson not guilty on the attempted murder count (Count 6) but guilty on all remaining counts.[2]  (*Id*. at pp. 30-50.)  The trial court sentenced Mr. Jefferson on October 18, 2021, to an aggregate sentence of life imprisonment without parole.[3]  (*Id*. at pp. 52-56.)

**B.      Direct Appeal**

On November 10, 2021, Mr. Jefferson filed a notice of appeal through counsel with the Fifth District Court of Appeals.  (ECF Doc. 9-1, pp. 57-60.)  In his March 29, 2022 appellate brief, Mr. Jefferson raised the following assignments of error:

1.      The trial court abused its discretion when it failed to order a competency evaluation of appellant.

2.      Appellant's convictions for aggravated burglary were not supported by sufficient evidence.  Therefore, his conviction for felony murder is not supported by sufficient evidence.

3.      Appellant's conviction for aggravated murder was not supported by sufficient evidence.

4.      Appellant's conviction for murder was against the greater weight of the evidence.

5.      The trial court abused its discretion when it failed to instruct the jury regarding self-defense.

---

[2] On October 19, 2021, the trial court entered a judgment entry of acquittal as to Count 6.  (*Id.* at p. 51.)

[3] The sentencing entry was filed on October 20, 2021.  (ECF Doc. 9-1, p. 52.)

(*Id*. at pp. 61-78.)  The State filed a brief in response on May 23, 2022.  (*Id*. at pp. 79-113.)  On September 29, 2022, the Fifth District Court of Appeals affirmed the trial court's judgment.  (*Id*. at pp. 114-41.)

On February 21, 2023, Mr. Jefferson filed a notice of appeal and motion for leave to file delayed appeal of the Fifth District's Opinion and Judgment Entry to the Ohio Supreme Court. (*Id*. at pp. 142-43, 144-78.)  On April 3, 2023, the State filed a motion to dismiss the motion for leave to file delayed appeal.  (*Id*. at pp. 179-80.)  On April 25, 2023, the Supreme Court of Ohio denied the State's motion to dismiss, granted Mr. Jefferson's motion for leave to file delayed appeal, and ordered Mr. Jefferson to file a memorandum in support of jurisdiction within 30 days.[4]  (*Id*. at p. 181-82.)  Petitioner states he placed his memorandum in support of jurisdiction in the prison mailbox on May 18, 2023, but it was not mailed by prison mailroom staff until May 23, 2023.  (ECF Doc. 13, p. 5 (citing ECF Doc. 12-1; ECF Doc. 12-2).)  On June 1, 2023, the Supreme Court of Ohio dismissed the cause for lack of prosecution because Mr. Jefferson failed to file his memorandum in support of jurisdiction by May 25, 2023, as required by the Rules of Practice of the Supreme Court of Ohio.  (*Id*. at p. 186.)

**C.     Application to Reopen Appeal**

On January 11, 2023, Mr. Jefferson filed a pro se motion for leave to file a motion for reopening pursuant to App. R. 26(B).  (ECF Doc. 9-1, pp. 187-88.)  He asserted that his appeal was not timely because:

> [He] was unable to have his motion for reopening printed off the word processor due to the librarian being off for the holidays and severe snow days of 24th thru 28th of December, 2022.  The untimeliness of the motion is not due to the Applicant's own actions but for the prison procedures of inmates use of the word processors

---

[4] Before learning of the denial of the State's motion to dismiss his motion for leave to file a delayed appeal, Mr. Jefferson filed a motion to strike the State's motion to dismiss, arguing the motion to dismiss was not timely filed. (ECF Doc. 9-1, p. 183-85.)  The motion to strike was denied as moot on June 1, 2023.  (*Id*. at p. 264.)

and the printing off the legal material.  The prison library rules require the librarian to be presence in order to have the legal documents.

Here, the Appellant due date for filing this application for reopening was due December 29, 2022.  The Librarian was off from December 23th to 28th making it impossible for the Appellant's motion for reopening to be timely.  The Appellant placed the motion in the prison mailbox on December 30th, 2022.

(*Id*. at p. 187.)  He argued that his appellate counsel was ineffective for failing to raise the following two assignments of error:

1.      Appellant received ineffective assistance of counsel when appellate counsel failed to raise that the trial court erred by failing to order a competency evaluation prior to trial in violation of his due process rights as codified in R.C. 2945.37(B).

2.      Appellant received ineffective assistance of counsel when appellate counsel failed to raise that trial counsel was ineffective for failing to challenge for cause or raised a preemptory challenge against a jury #7 in violation of the Sixth Amendment right to a fair trial.

(*Id*. at p. 192-94.)  On February 7, 2023, the State filed a memorandum in opposition to Mr. Jefferson's delayed application for reopening.  (*Id*. at pp. 195-207.)  On February 21, 2023, the court of appeals denied Mr. Jefferson's motion for leave to file a motion for reopening.  (*Id*. at pp. 208-11.)  It found that, while Mr. Jefferson "provide[d] an explanation for the delay between December 24 and December 29, . . . [he] d[id] not address the remaining days within which the motion may have been filed" and there was "no reference to inability to access the record, legal materials, or any other information, nor . . . [was] any other good cause referenced that would provide a reasonable excuse for the delay."  (*Id*. at p. 209.)  It also found that his proposed assignments of error undermined his contention that he had good cause for his delayed filing.  (*Id*. at pp. 209-10.)  In this regard, the court explained that Mr. Jefferson had "information regarding both proposed assignments of error on or before the date of his conviction but . . .

13

failed to provide any explanation for his failure to file his motion to reopen the appeal within ninety days except for his inability to access the library printer on the eve of the deadline." (*Id*.)

On April 7, 2023, Mr. Jefferson filed a pro se appeal from the denial of his motion to reopen his appeal and memorandum in support of jurisdiction. (*Id*. at pp. 212-13, 214-32.) He asserted the following propositions of law:

I. Appellate counsel's performance was deficient for failing to raise the issue of the trial court abused its discretion in failing to submit the competency evaluation before holding a competency hearing pursuant to R.C. 2945.37(E) in violation of due process of the 14th Amendment.

II. Appellate counsel's provided ineffective assistance of counsel for failing to raise that the trial counsel was ineffective for failing to use for cause or a preemptory challenge to remove Juror #7 from the jury pool.

III. Appeal court violated Appellant's due process rights set forth by the 14th Amendment by applying a strict standards of Ohio R. App. R. 5(A) to Appellant's application to reopen pursuant to Ohio R. App. P. 26(B).

(*Id*. at pp. 221-28.) The State filed a memorandum in opposition to jurisdiction on May 5, 2023. (*Id*. at pp. 233-42.) On June 20, 2023, the Supreme Court of Ohio declined to accept jurisdiction of the appeal. (*Id*. at p. 243.)

**D.      Federal Habeas Corpus Petition**

Mr. Jefferson raises six grounds for relief in his Petition. (ECF Doc. 1, pp. 5, 18-30.)

**GROUND ONE:** WHERE PETITIONER 'HAS SHOWN SIGNS OF INCOMPETENCY PRIOR TO TRIAL' WAS DENIED DUE PROCESS UNDER THE FIFTH AND FOURTEENTH AMENDMENTS WHEN THE TRIAL COURT SUBJECTED THE PETITIONER TO A TRIAL WITHOUT A SUBMISSION OF A COMPETENCY EVALUATION.

**GROUND TWO:** PETITIONER WAS CONVICTION OF AGG. BURGLARY WHERE THE STATE FAILED TO PROVE EACH AND EVERY ELEMENT IN VIOLATION OF STATUTORY AND PROCEDURAL DUE PROCESS UNDER THE FIFTH AND FOURTEENTH AMENDMENTS.

**GROUND THREE:** WHEN THE STATE FAILED TO PRESENT SUFFICIENT EVIDENCE FOR PRIOR CALCULATION AND DESIGN TO SUPPORT A CONVICTION OF AGGRAVATED MURDER BEING DENIED A FAIR TRIAL

14

AND DUE PROCESS UNDER FIFTH, SIXTH, AND FOURTEENTH AMENDMENTS OF THE U.S. CONSTITUTION.

**GROUND FOUR:** THE PETITIONER WAS DENIED A FAIR TRIAL AND DUE PROCESS WHEN THE TRIAL COURT REFUSED TO GIVE SELF-DEFENSE INSTRUCTION BASED ON UNREASONABLE DETERMINATION OF FACTS GIVEN AT TRIAL AND WHERE THE RECORD CONTAINS EVIDENCE THAT PETITIONER ACTED IN SELF DEFENSE IN VIOLATION OF FIFTH, SIXTH, AND FOURTEENTH AMENDMENTS UNDER THE UNITED STATES CONSTITUTION.

**GROUND FIVE:** PETITIONER RECEIVED INEFFECTIVE ASSISTANCE OF APPELLATE COUNSEL WHEN IT FAILED TO RAISE TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING USE FOR CAUSE OR PREEMPTORY CHALLENGE TO REMOVE JUROR #7 FOR BIAS IN VIOLATION OF EFFECTIVE ASSISTANCE OF COUNSEL AND FAIR TRIAL UNDER THE SIXTH AND FOURTEENTH AMENDMENTS.

**GROUND SIX:** THE APPELLATE COURT DENIED PETITIONER A PROCEDURAL DUE PROCESS RIGHT AND VIOLATED THE EQUAL PROTECTION CLAUSE BY THE FOURTEENTH AMENDMENT UNDER THE UNITED STATES CONSTITUTION.

(*Id.*)[5]

### IV.    Law & Analysis

**A.    Standard of Review Under AEDPA**

The Antiterrorism and Effective Death Penalty Act of 1996, PL 104–132, April 24, 1996, 110 Stat 1214 ("AEDPA") limits the adjudication of federal habeas petitions in which state prisoners have collaterally attacked their convictions.  *See Reed v. May*, 134 F.4th 455, 459 (6th Cir.), *cert. denied sub nom. Reed v. Fredrick*, 146 S. Ct. 226, 223 L. Ed. 2d 78 (2025); *see also Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) ("As amended by AEDPA, 28 U.S.C. § 2254 sets several limits on the power of a federal court to grant an application for a writ of habeas corpus on behalf of a state prisoner.").  Under 28 U.S.C. § 2254, as amended by AEDPA, federal courts may "entertain only those applications alleging that a person is in state custody 'in violation of

---

[5] The supporting facts for each ground for relief in the Petition (ECF Doc. 1, pp. 18-30) are not recounted herein.

the Constitution or laws or treaties of the United States'" and in most instances, federal courts may not grant habeas relief "unless . . . the applicant has exhausted state remedies." *Cullen*, 563 U.S. at 181 (citing 28 U.S.C. §§ 2254(a), (b), (c)).

"AEDPA's 're-litigation bar' applies when a state court denies a prisoner's claim on the merits, rather than denying it for procedural reasons." *Reed*, 134 F.4th at 459 (citing 28 U.S.C. § 2254(d); *Harrington v. Richter*, 562 U.S. 86, 98 (2011)). Under the "re-litigation bar," when a federal habeas application involves a claim that was "adjudicated on the merits in State court proceedings," the application "shall not be granted" unless the State court adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)-(2); *Cullen*, 563 U.S. at 181; *Harrington*, 562 U.S. at 100. The burden of proof rests with the petitioner. *See Cullen*, 563 U.S. at 181.

The Sixth Circuit has explained that "AEDPA authorizes a federal court to grant a writ of habeas corpus for state prisoners only to guard against 'extreme malfunctions in the state criminal justice systems.'" *Hodge v. Plappert*, 136 F.4th 648, 657 (6th Cir. 2025), *cert. denied*, No. 25-6179, 2026 WL 79639 (U.S. Jan. 12, 2026) (quoting *Shinn v. Ramirez*, 596 U.S. 366, 377 (2022)). This is because "Congress recognized that '[f]ederal habeas review of state convictions frustrates both the States' sovereign power to punish offenders and their good-faith attempts to honor constitutional rights.'" *Hodge*, 136 F.4th at 657–58 (quoting *Harrington*, 562 U.S. at 103) (brackets in original). "Congress designed 28 U.S.C. § 2254(d) to remind federal courts that 'state courts are the principal forum for asserting constitutional challenges to state convictions.'" *Hodge*, 136 F.4th at 658 (quoting *Harrington*, 562 U.S. at 103).

16

Although Respondent asserts that Mr. Jefferson procedurally defaulted Grounds One through Six of the Petition (ECF Doc. 9, pp. 13, 19-22, 46-52; ECF Doc. 14, pp. 7-20), the Sixth Circuit has explained that "federal courts are not required to address a procedural-default issue before deciding against the petitioner on the merits." *Hudson v. Jones*, 351 F. 3d 212, 215 (6th Cir. 2003). In this case, the undersigned concludes that judicial economy warrants examining the claims in Grounds One, Two, Three, Four, and Six on the merits, without first addressing Respondent's procedural default arguments. *See id.* ("Judicial economy might counsel giving the [other] question priority, for example, if it were easily resolvable against the habeas petitioner, whereas the procedural-bar issue involved complicated issues of state law.") (quoting *Lambrix v. Singletary*, 520 U.S. 518, 525 (1997)) (bracket in *Hudson*); *see also* 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State.") Accordingly, the undersigned will address the merits of the claims in Grounds One, Two, Three, Four, and Six, and will address procedural default only as to Ground Five.

**B.      Ground One is Without Merit**

In Ground One, Petitioner asserts that he was denied due process because he was tried without "a competency evaluation" despite showing signs of incompetency prior to trial. (ECF Doc. 1, pp. 18-19; ECF Doc. 13, pp. 18-21.) Specifically, he argues that the trial court "failed to give . . . [him] a meaningful and proper competency hearing" when it granted his motion to appoint a forensic psychologist to perform "a psychiatric examination of [his] competency" on October 7, 2021, but then "conducted a competency hearing prior to [him] having the psychiatric evaluation completed" on October 8, 2021. (ECF Doc. 1, pp. 18-19; *see also* ECF Doc. 13, pp. 20-21.) On this basis, he argues the state court of appeals rendered a decision that was contrary

17

to or an unreasonable application of federal law and/or based on an unreasonable determination of facts in light of the evidence presented.[6]  (ECF Doc. 1, p. 19; ECF Doc. 13, pp. 20-21.)

Respondent disputes Mr. Jefferson's assertion that the trial court granted the defense motion for a psychiatric examination (ECF Doc. 14, p. 4) and argues that Ground One is not cognizable on federal habeas review and/or is without merit.  (ECF Doc. 9, pp. 26-29; ECF Doc. 14, pp. 1-7.)  More particularly, Respondent argues there is no "Supreme Court . . . standard for determining when a trial court should hold evidentiary proceedings on the matter of competency" and there is no clearly established federal law requiring that a competency hearing include a "clinical licensed psychologist examination."  (*Id.*)

### 1.	Legal Framework for Competency to Stand Trial

"[T]he Due Process Clause of the Fourteenth Amendment prohibits the criminal prosecution of a defendant who is not competent to stand trial."  *Medina v. California*, 505 U.S. 437, 439 (1992) (citing *Drope v. Missouri*, 420 U.S. 162 (1975); *Pate v. Robinson*, 383 U.S. 375 (1966)); *Drope*, 420 U.S. at 171 ("[A] person whose mental condition is such that he lacks the capacity to understand the nature and object of the proceedings against him, to consult with counsel, and to assist in preparing his defense may not be subjected to a trial.").  This

---

[6]Although Mr. Jefferson also makes vague statements suggesting the trial court erred by not granting a motion for a psychiatric examination to determine if he was competent at the time the offenses were committed (ECF Doc. 1, p. 19; ECF Doc. 13, p. 20), the argument is not adequately developed and no such claim was presented to the state court of appeals (ECF Doc. 9-1, p. 69).  Thus, to the extent Petitioner intended to raise a federal habeas claim relating to his competence at the time of the offense in Ground One, the claim was not exhausted and was waived through lack of developed argument.  *See McPherson v. Kelsey*, 125 F.3d 989, 995 (6th Cir. 1997) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.") (internal citations omitted) (alterations in original).  Further, the governing standard articulated by the Supreme Court in *Ake v. Oklahoma*, 470 U.S. 68 (1985) "is triggered only where a defendant makes a threshold showing that his mental condition is 'seriously in question[]'" and "[t]his showing is made by supplying particular facts demonstrating the necessity of a psychiatrist, not just by making general allegations of need." *Miller v. Bell*, 655 F. Supp. 2d 838, 851 (E.D. Tenn. 2009) (citations omitted), *aff'd sub nom. Miller v. Colson*, 694 F.3d 691 (6th Cir. 2012).  Petitioner has not made the necessary particularized showing, so the claim would also fail on its merits.

"prohibition is fundamental to an adversary system of justice." *Drope*, 420 U.S. at 172. The Supreme Court has therefore adopted a competency test "to ascertain whether a criminal defendant 'has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and whether he has a rational as well as factual understanding of the proceedings against him.'" *Id.* (quoting *Dusky v. United States*, 362 U.S. 402 (1960)). The Supreme Court has also "held that the failure to observe procedures adequate to protect a defendant's right not to be tried or convicted while incompetent to stand trial deprives him of his due process right to a fair trial." *Id.* at 173 (citing *Pate*, 383 U.S. 375).

In *Pate*, the Supreme Court held that a trial court's failure to conduct a hearing regarding a defendant's competency "deprived [him] of his constitutional right to a fair trial," based on an examination of "the evidence introduced on [the defendant's] behalf." 383 U.S. at 385.[7] The Court also specified that a competency hearing would be needed on remand if "a sufficient doubt exist[ed] as to [the defendant's] present competence." *Id.* at 387. But the Court "did not prescribe a general standard for determining whether the trial court should resort to evidentiary proceedings." *Williams v. Bordenkircher*, 696 F.2d 464, 466 (6th Cir. 1983) (citing *Pate*); *see also Drope*, 420 U.S. at 173 (explaining that *Pate* did not "prescribe a general standard with respect to the nature or quantum of evidence necessary to require" competency proceedings).[8]

---

[7] Some of the factors the *Pate* Court considered in finding a constitutional violation included: uncontradicted testimony from four witnesses revealing a long history of disturbed behavior; evidence of a prior psychiatric hospital admission; the prior shooting and killing of his young son before shooting himself; officer observations of behavior following the charged crime; and agreed deficiencies in the only evidence of competency. *See* 383 U.S. at 378-86.

[8] The Sixth Circuit acknowledges that the Supreme Court has not "prescribe[d] a standard for determining when a trial court should hold evidentiary proceedings on the matter of competency." *See Carter v. Bogan*, 900 F.3d 754, 769 (6th Cir. 2018). In addressing competency claims, the Sixth Circuit has "used the following test: 'whether a reasonable judge, situated as was the trial court judge whose failure to conduct an evidentiary hearing is being reviewed, should have experienced doubt with respect to competency to stand trial.'" *Id.* (citing *Filiaggi v. Bagley*, 445 F.3d 851, 858 (6th Cir. 2006), quoting *Williams*, 696 F.2d at 467). Nevertheless, "circuit precedent does not constitute 'clearly established Federal law, as determined by the Supreme Court,'" as required under 28 U.S.C. § 2254(d)(1). *Parker v. Matthews*, 567 U.S. 37, 48-49 (2012). Accordingly, any Sixth Circuit standards that are distinct from Supreme Court precedent "cannot form the basis for habeas relief under AEDPA." *Id.*

19

In *Drope*, the Supreme Court again found that a trial court's "failure to make further inquiry into [a defendant's] competence to stand trial[] denied him a fair trial," after considering "the evidence possibly relevant to [the defendant]'s mental condition that was before the trial court prior to trial and thereafter." *See* 420 U.S. at 174-82.  The Court went on to explain:

> The import of our decision in Pate v. Robinson is that evidence of a defendant's irrational behavior, his demeanor at trial, and any prior medical opinion on competence to stand trial are all relevant in determining whether further inquiry is required, but that even one of these factors standing alone may, in some circumstances, be sufficient. There are, of course, no fixed or immutable signs which invariably indicate the need for further inquiry to determine fitness to proceed; the question is often a difficult one in which a wide range of manifestations and subtle nuances are implicated.

*Id.* at 180.[9]  In the context of this fact-specific inquiry, the Court observed that the difficulty of evaluating such evidence "is suggested by the varying opinions trained psychiatrists can entertain on the same facts." *Id.*  Thus, the "[t]he constitutional obligation to hold an evidentiary hearing depends heavily on the factual circumstances of each case." *Williams*, 696 F.2d at 466 n. 1.

Further, the Sixth Circuit has recognized that a "determination of competence is a factual finding, to which deference must be paid." *Filiaggi v. Bagley*, 445 F.3d 851, 858 (6th Cir. 2006) (citing *Thompson v. Keohane*, 516 U.S. 99, 111 (1995)); *see also Carter v. Bogan*, 900 F.3d 754, 769-70 (6th Cir. 2018) ("[C]ompetence to stand trial is a question of fact[.]") (citing *Thompson*, 516 U.S. at 111).  "[W]ide latitude" is therefore given to state court decisions reviewed in federal habeas proceedings, considering the "open-ended standards and the high threshold for establishing incompetence." *Cowans v. Bagley*, 639 F.3d 241, 247 (6th Cir. 2011) (citing *Yarborough v. Alvarado,* 541 U.S. 652, 664 (2004)); *see id.* ("When virtually everything is

---

[9] Some of the factors the *Drope* Court considered in finding a constitutional violation included: irrational behavior prior to trial; findings in a psychiatric evaluation; testimony from the defendant's wife that he needed psychiatric care and tried to choke her the night before the trial; the defendant's suicide attempt while the trial was underway; and the trial judge's inability to observe the defendant's demeanor and ability to cooperate with his attorney through much of the trial because the defendant was in the hospital recovering from his suicide attempt.  420 U.S. at 169-82.

potentially relevant and nothing is dispositive, reasonable minds occasionally may come to different conclusions about whether to hold a competency hearing.").

While a prior medical opinion may be relevant to an inquiry into whether a defendant is competent to stand trial, the Sixth Circuit has explained that "[c]learly established Supreme Court precedent does not require . . . input [from a psychiatrist] at a competency hearing." *Woodley v. Bradshaw*, 451 F. App'x 529, 537 (6th Cir. 2011).

### 2. State Court Adjudication of Petitioner's Competency Claim

On direct appeal, the state court of appeals addressed the merits of Mr. Jefferson's competency evaluation claim as follows:

{¶37} Appellant, in his first assignment of error, argues that the trial court abused its discretion when it failed to order a competency evaluation of appellant. We disagree.

{¶38} We review the decisions of the trial court regarding competency evaluations for an abuse of discretion. See, *State v. Dye,* 5th Dist. Licking No. 99–CA–2, 1999 WL 770619, (Sept. 2, 1999). In order to find that the trial court abused its discretion, we must find that the trial court's decision was unreasonable, arbitrary or unconscionable and not merely an error of law or judgment. *Blakemore v. Blakemore,* 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983).

{¶39} In determining whether a defendant is competent to stand trial, the test is " ' "whether [the defendant] has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and whether he has a rational as well as factual understanding of the proceedings against him." ' " *State v. Neyland*, 139 Ohio St.3d 353, 2014-Ohio-1914, 12 N.E.3d 1112, ¶ 32, citing *State v. Berry*, 72 Ohio St.3d 354, 359, 650 N.E.2d 433 (1995), quoting *Dusky v. United States*, 362 U.S. 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960). It is with this standard in mind that we review the evidence in this record to determine whether appellant raised a genuine question as to his competency to stand trial and whether the trial court abused its discretion by declining to order an evaluation.

{¶40} Appellant, in the case sub judice, filed a motion requesting a competency evaluation on October 6, 2021. A hearing on the motion was held on October 8, 2021. At the hearing, appellant testified that he dropped out of school in the tenth grade and that he had never been charged with a crime before. At the hearing, appellant testified that he had not been to any type of doctor in a long time. Appellant testified that, when asked what type of penalty that he would get if

convicted of aggravated murder, that it would be "[p]retty extensive." Transcript of October 8, 2021 hearing at 5.

{¶41} During the hearing, the following argument occurred on the record:

{¶42} MS. SCHUMACHER [ASSISTANT PROSECUTING ATTORNEY]: Additionally, Judge, we did -- obviously, we were in trial mode, focused on trial ... proof beyond a reasonable doubt. When we received Miss Kaiser's motion, we did then kind of shift gears a little bit, try to get supporting evidence.

There was two phone calls that the Defendant had made in jail, and I'll present those to the Court as well. In those phone calls, you can hear the Defendant -- I will warn the Court it is very difficult to hear him. It is best heard with headphones. His voice maybe can be picked up a little bit better there. But in the – I'll just mark it State's Exhibit 4, this phone call. The file path is marked 3274869 underscore 4669Q underscore 1062021. This was made to phone number 419 -- I can't read this -- 522-1090. You can hear that there's general discussion, and then the gist of the conversation is that it's normal, it's flowing, we understand where we're at, current time, place, those types of impressions. There's even a conversation about the Defendant indicating that if I were out, I wouldn't be sitting around doing nothing. I would be doing something. So not like a psychotic indication. He's present in the conversation. But, most notably, around the 15-minute mark, the Defendant starts talking about the State's witnesses and those that we subpoenaed, specifically asking that the person, the female, he's talking to actually call this person and see what she is going to testify to. She's got to show up on Monday, meaning there's awareness of the Defendant of something is happening on Monday. And I think he even specifically mentions the word "trial" or "court." Okay?

{¶43} THE COURT: Okay.

{¶44} MS. SCHUMACHER: The Defendant even says that that witness -- I believe her name is -- it might be Tia, as it comes across. But he mentions that she had surgery, so there's even – he's been keeping up in the present, in his present mind, following what is happening with people, understanding, making the connection in his own mind that if she is recovering from surgery, even the ability to come to court is in question. He then finally ends that conversation with you got to make contact with her.

That phone call might not be as telling as the next phone call, Judge. And I'll mark that State's Exhibit 5. Again, we're talking with another female. This file is 3272451 underscore 46692 underscore 1042021. This is phone number 1-419-545-9287. Here, the Defendant discusses visitors, visits with the female. The female asks -- or the Defendant states five minutes in, I have to go to court next week. And keep in mind this is referencing -- this phone call occurred on October 4th of 2021, thereby making I have to go to court next week very relevant. One week from the 4th puts that on October 11th. The female asks the Defendant, Are you nervous? Are you

okay? He says, I don't know. The Defendant says sometimes they give you a plea deal. The Defendant says I talked about a plea deal, my lawyer came. The female asks, Can you tell me more or no? The Defendant is very quiet, yet, though, at six minutes, five seconds, I'm not going to tell nobody. Other conversation continues about six minutes and 25 seconds. Then the female asks, Is it a good deal or a bad deal? The Defendant says, Bad. Conversation goes on. Was it worse that what you were thinking you would get a trial? Was it a never-ever-see-the-light-of-day plea? The Defendant says, Promise not to tell nobody what I say. The female says, I ain't going to tell nobody. They pinky swear, and he says, They offered me 42 years.

It is true, Judge, that the State never offered, quote, unquote, flat time at 42 years. But that conversation is very telling in the sense that there were pretrial negotiations between counsel indicating -- where the defense had requested flat time. If we're looking at the most egregious charges, our estimation is within the time frame of about 43 years to life. And here the Defendant is recognizing -- he keyed up on that 42, so he's following along in these conversations and understanding the consequences, when you go back to it is a never-ever-see-the-light-of-day plea.

So when you're talking about a man who is 44 years old now getting an offer of -- quote, unquote, offer of 42 years, making him potentially 86 years old, there's a recognition that this is a never-ever type of plea offer. There(sic) conversation continues, Judge, to the point of where they talk about usually this is a 25-to-life max. The Defendant says, They expect you to take the deal; if you don't take the deal, they're going to double it if you go to trial. So he is recognizing consequences of going to trial and accepting a plea.

Again, I'm highlighting this as when we're looking at a competency evaluation, is he understanding the proceedings against him, is he able to assist in his defense. As he proceeds in that conversation, he talked about your lawyer couldn't get a better one, so we're recognizing roles and relationships in the courtroom, recognizing what his attorney is supposed to be doing for him.

He even comes back with the understanding they want, the people want, the death penalty. That's significant as well, because prior to our hearing here today, very early on in the case in that same conversation where I referenced that potential plea negotiation, what might be deemed a plea negotiation, it was explained from the family, like, if we even offer you the .... Minimum maximum of about 43 to life, the family still wants the death penalty, explaining that the family if very upset. So that was definitely conveyed to the Defendant. The Defendant was understanding that. And when he reiterates that several months later and tell this other female on the phone that they want the death penalty, I think there can be no doubt that the Defendant is certainly competent to stand trial at this point.

{¶45} THE COURT: Okay.

23

{¶46} MS. SCHUMACHER: They go on and explain even current legislation and talk about current legislation, talking about the abolishment of the death penalty and the house bill and specific house bill number that is currently pending with the legislation.

Finally, then, what was -- the State's understanding, and maybe defense wants to admit it as a joint exhibit. If not, I think the State will offer it -- is the Defendant's affidavit which apparently spurred this motion. And within that affidavit – I'll just mark it as State's Exhibit 6, Judge. Within that affidavit, the Defendant talks about requesting a dismissal of the indictment because if failed to state an offense thereon. He explains that he hasn't had the opportunity to be confronted with the witnesses. I think the Court can go ahead and read it on its own time but you get the gist that he is making sound legal arguments, albeit at times he talks in terms of someone that might be considered a sovereign citizen.

So with that, based on the case law cited within our response to the Defendant's motion, I think the Court is well within bounds to find the Defendant competent, if the Court interprets this motion as a competency motion, and even without a forensic evaluation. Your Honor.

{¶47} Transcript of October 8, 2021 hearing at 12-16. When asked by the trial court whether he would rather have a bench or jury trial, appellant indicated that he wanted to talk to his attorney.

{¶48} At the conclusion of the hearing, the trial court found appellant competent to stand trial, finding that he was capable of understanding the nature and objectives against him and of assisting in his own defense. The trial court, as trier of fact, was in the best position to assess appellant's credibility and competency. The evidence presented at the hearing did not overcome the presumption that appellant was competent to stand trial.

{¶49} We find, viewing the transcript, that the trial court did not abuse its discretion because the court's decision was not arbitrary, unconscionable or unreasonable.

{¶50} Appellant's first assignment of error is, therefore, overruled.

*Jefferson*, 2022-Ohio-3448, 2022 WL 4545848, at *5-7.

### 3.    Petitioner Has Not Shown That the State Court Erred Under AEDPA

In Ground One, Mr. Jefferson asserts that the state appellate court decision affirming the

trial court's finding that he was competent to stand trial was "an unreasonable application of

federal law" as articulated by the Supreme Court in *Pate* and *Drope*.  (ECF Doc. 1, p. 19; *see*

24

*also* ECF Doc. 13, pp. 19-21.)[10]  In particular, he argues that he was denied "a meaningful and proper competency hearing" when the trial court did not obtain "a competency evaluation prior to the hearing, despite the trial court granting the defense motion for a psychiatric examination," and further asserts that the trial court "failed to apply proper weight to the evidence suggesting his incompetence." (ECF Doc. 13, p. 20.)  In his Traverse, he also asserts that the decision to have him "stand trial without the competency report was an unreasonable determination of the facts in light of the evidence presented at the state court proceedings." (*Id.* at p. 21.)

Mr. Jefferson's arguments align with the AEDPA requirements that he show either that the state court decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. §§ 2254(d)(1)-(2); *Cullen*, 563 U.S. at 181.  For the reasons set forth below, the undersigned concludes that Mr. Jefferson has not met either standard here.

### i.    Petitioner Has Not Shown That the State Court Made an Unreasonable Determination of the Facts in Light of the Evidence

The undersigned begins with Mr. Jefferson's argument that the trial court's finding that he was competent to stand trial without first obtaining and considering a "competency report" was an unreasonable determination of the facts in light of the evidence presented at the state court proceedings under 28 U.S.C. § 2254(d)(2). (ECF Doc. 13, p. 21.)

---

[10] Petitioner also cites Sixth Circuit cases in his Traverse—*Filiaggi v. Bagley*, 445 F.3d 851 (6th Cir. 2006) and *Eley v. Bagley*, 604 F.3d 958 (6th Cir. 2010). (ECF Doc. 13, pp. 18-20.)  But it is well-established that "circuit precedent does not constitute 'clearly established Federal law, as determined by the Supreme Court,'" as required under 28 U.S.C. § 2254(d)(1). *Parker*, 567 U.S. at 48-49.  Thus, any standards in the cited federal circuit cases that are distinct from the established Supreme Court precedent "cannot form the basis for habeas relief under AEDPA." *Id.* Further, the Sixth Circuit affirmed denial of the petitioners' habeas petitions in both *Filiaggi*, 445 F.3d 851, and *Eley*, 604 F.3d 958, even though there was no hearing on competency in *Eley*, *see id.* at 965.

25

The Sixth Circuit has explained that "[a] state court decision involves 'an unreasonable determination of the facts in light of the evidence presented in the State court proceeding' only if it is shown that the state court's presumptively correct factual findings are rebutted by 'clear and convincing evidence' and do not have support in the record." *Matthews v. Ishee*, 486 F.3d 883, 889 (6th Cir. 2007) (quoting and citing 28 U.S.C. § 2254(d)(2) and § 2254(e)(1)); *see Sumner v. Mata,* 449 U.S. 539, 546-47 (1981) (holding that the presumption of correctness also applies to factual findings made by a state appellate court based on the trial record).  "[A] state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." *Burt v. Titlow*, 571 U.S. 12, 18 (2013) (internal citations and quotations omitted).

Mr. Jefferson does not clearly identify what, if any, factual findings relied on by the state court he believes were rebutted by clear and convincing evidence.  Even more problematic, one of the primary factual assertions underlying Petitioner's argument in Ground One appears to be contrary to the evidentiary record.  Specifically, Mr. Jefferson contends that the trial court "[o]n October 7, 2021, . . . ordered a psychiatric examination of [his] competency" (ECF Doc. 1, p. 18), but the record does not support a finding that a psychiatric examination was ordered on that date.  Instead, the trial court set a hearing "to determine if an examination as to the defendant's competency [wa]s really necessary."  (ECF Doc. 9-1, p. 24; *see also id*. at p. 25 ("The court immediately set the matter for hearing pursuant to R.C. 2945.37(C) to determine if a forensic exam was necessary and to determine if the defendant was competent.").)  Following that hearing, after questioning Mr. Jefferson at length and considering exhibits, the trial court found that "a forensic exam [wa]s not necessary or warranted" and that Mr. Jefferson was "competent to stand trial based on the information before the court."  (ECF Doc. 9-1, pp. 25-26.)

26

Thus, there is no evidentiary support for Mr. Jefferson's repeated assertion that the trial court granted his motion for a psychiatric evaluation before holding a competency hearing without the benefit of such an evaluation.  Because Mr. Jefferson has failed to show that "the state court's presumptively correct factual findings are rebutted by 'clear and convincing evidence' and do not have support in the record," the undersigned concludes that he has failed to support a challenge under 28 U.S.C. § 2254(d)(2) to the state court's finding that he was competent to stand trial.  *See Matthews*, 486 F.3d at 889 (citations omitted).

> **ii.     Petitioner Has Not Shown the State Court's Decision Was Contrary to or an Unreasonable Application of Clearly Established Federal Law**

The undersigned turns next to Mr. Jefferson's argument that the appellate decision upholding the trial court's competency finding "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," under 28 U.S.C. §§ 2254(d)(1).  As discussed above, the Court need not consider arguments that the state court granted a motion for a competency examination but then held a competency hearing without that examination, since Mr. Jefferson has produced no evidence to support such a finding.  Instead, this Court must consider whether the state court of appeals unreasonably applied or acted contrary to the federal law established in *Pate* and *Drope* when it upheld the trial court's finding that Mr. Jefferson was competent to stand trial.

In *Pate*, the Supreme Court held that a criminal defendant was deprived of a fair trial when the state trial court refused to even conduct a hearing to assess his competence to stand trial despite "uncontradicted testimony of [the defendant]'s history of pronounced irrational behavior"—including visual and audio hallucinations that resulted in a psychiatric hospitalization, and violent behavior that included shooting and killing his own 18-month-old son—and the prosecutor's own concession that it was probably necessary to obtain testimony

27

from a state doctor as to whether the defendant was "sane or insane." 383 U.S. at 383-86. But having found that specific defendant's "constitutional rights were abridged by his failure to receive an adequate hearing on his competence to stand trial," 383 U.S. at 386, the Supreme Court in *Pate* "'did not prescribe a general standard for determining whether the trial court should resort to evidentiary proceedings,'" *Filiaggi*, 445 F.3d at 858 (quoting *Williams,* 696 F.2d at 466 (discussing *Pate*)).

The facts that informed the Supreme Court's decision in *Pate* are clearly distinct from the facts before this Court. Here, not only did Mr. Jefferson fail to present the type of evidence that raised a bona fide doubt as to the competence of the defendant in *Pate*, but the trial court—unlike the trial court in *Pate*—conducted a competency hearing before finding Mr. Jefferson competent to stand trial. *Cf. Filiaggi*, 445 F.3d at 858 ("The due-process right to a fair trial is violated by a court's failure to hold a proper competency hearing where there is substantial evidence that a defendant is incompetent.") (citing *Pate*, 383 U.S. at 385-86). Petitioner has thus failed to show that the state court decision upholding the trial court's competency determination was contrary to or unreasonably applied federal law under *Pate.*

Turning to *Drope*, the Supreme Court in that case considered whether the trial court's "failure to make further inquiry into [a] petitioner's competence to stand trial[] denied him a fair trial." 420 U.S. at 174-75. The trial court did not order a psychiatric examination when defense counsel argued the defendant should undergo an examination and receive psychiatric treatment before trial, and did not delay the trial when counsel objected that "the defendant [wa]s not a person of sound mind and should have a further psychiatric examination before the case should be forced to trial." *Id.* at 164-65. The court also denied a defense motion for mistrial when the defendant shot himself on the morning of the second day of trial, and then allowed the trial to

28

continue without the defendant while he recovered in the hospital.  *Id.* at 166-67.  Recognizing that there was not a "general standard with respect to the nature or quantum of evidence necessary to" require a competency inquiry, *id.* at 172, the *Drope* Court found the evidence before the trial court, in the context of the petitioner's suicide attempt during trial, "created a sufficient doubt of [the petitioner's] competence to stand trial to require further inquiry on the question," *id.* at 180.  Specifically, the Court highlighted a psychiatric evaluation noting the defendant's "markedly circumstantial and irrelevant . . . speech" and diagnoses of sociopathic personality disorder and borderline mental deficiency, *id.* at 165, n. 1, 175-76, and trial testimony from the defendant's wife that she decided not to prosecute because the defendant "was sick and needed psychiatric care" but changed her mind when he attempted to choke and kill her on the eve of trial, *id.* at 165-66, 179.  *See id.* at 180.  The Court further observed that the decision to complete the trial without the defendant present after his suicide attempt precluded further opportunities for the court to "gauge from [the defendant's] demeanor whether he was able to cooperate with his attorney and to understand the nature and object of the proceedings against him."  *Id.* at 180-82.

Here, Mr. Jefferson identifies "numerous indicators of [his] incompetence" that include a tenth grade education, lack of experience with the criminal justice system, lack of understanding of specific functions of the judicial system, and his own claim to be a "sovereign citizen."  (ECF Doc. 13, p. 18; *see* ECF Doc. 1, p. 18.)  Even setting aside Mr. Jefferson's failure to identify evidentiary support for the factors he identifies, those factors lack the significance and severity of the facts that guided the Supreme Court's decision in *Drope*.  For example, here there was no psychiatric examination noting marked clinical findings and serious psychiatric diagnoses, no trial testimony describing significant psychiatric symptoms and irrational, violent behavior on

29

the eve of trial, and no interruption of the trial due to a suicide attempt.  Further, the trial court in this case responded to Mr. Jefferson's motion by holding a competency hearing where the court questioned Mr. Jefferson at length and considered evidence presented by the state, including two jailhouse calls where Mr. Jefferson engaged in discussions indicative of an understanding of the proceedings and an ability to aid in his own defense.  (*See* ECF Doc. 9-1, p. 25-26; *id.* at pp. 125-29, ¶¶ 41-48.)  In contrast, the trial court in *Drope* took no action on an unopposed request to continue the trial to allow for psychiatric evaluation, did not declare a mistrial or delay proceedings for further psychiatric evaluation following the defendant's suicide attempt, and then completed the trial without the defendant present.  Petitioner has clearly failed to show that the state court's decision upholding the competency finding in this case was contrary to or unreasonably applied the federal law established in *Drope*.

Consistent with clearly established federal law, the state court of appeals in this case considered the applicable test for assessing competence to stand trial and concluded: "The evidence presented at the hearing did not overcome the presumption that appellant was competent to stand trial." *Jefferson*, 2022-Ohio-3448, 2022 WL 4545848, at *7, ¶ 48.  This "determination of competence [wa]s a factual finding, to which deference must be paid," *Filiaggi*, 445 F.3d at 858 (citing *Thompson*, 516 U.S. at 111), and Mr. Jefferson has failed to show that the findings were contrary to or an unreasonable application of *Pace* or *Drope*.

It is also worth noting that neither *Drope* nor *Pate* stands for the proposition that a trial court must obtain a competency examination before deciding whether a defendant is competent to stand trial.  Indeed, the Sixth Circuit in *Woodley* rejected a claim that a competency hearing is improper without input from a psychiatrist, explaining: "[c]learly established Supreme Court precedent does not require such input at a competency hearing, and under Ohio law, the decision

30

to order a mental evaluation based on the evidence submitted at a competency hearing is left to the discretion of the trial court." *See* 451 F. App'x at 537.  Thus, federal law does not support a finding that it was necessarily error for the state court of appeals to uphold the trial court's competency determination when the court did not order a psychiatric examination.

The state court of appeals found that the trial court "was in the best position to assess [Mr. Jefferson]'s credibility and competency," and that the evidence presented to the trial court "did not overcome the presumption that [Mr. Jefferson] was competent to stand trial." *Jefferson*, 2022-Ohio-3448, ¶48.  Mr. Jefferson has failed to show that the state court's reasoned analysis is contrary to or an unreasonable application of *Drope* or *Pate*.  The undersigned further concludes, considering the record before the state court of appeals, that it cannot be said the "'state court's ruling on [Mr. Jefferson's] claim . . . was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" *Bobby v. Dixon*, 565 U.S. 23, 24 (2011) (quoting *Harrington*, 562 U.S. at 103). Accordingly, the undersigned recommends that the Court **DENY** Ground One on the merits.

### C.      Grounds Two and Three are Without Merit

In Grounds Two and Three, Mr. Jefferson raises sufficiency of the evidence claims. (ECF Doc. 1, pp. 19-23.)  In Ground Two, he challenges his conviction for aggravated burglary, arguing the State failed to present sufficient evidence to establish that he used force, stealth, or deception to enter the motel room.  (*Id*. at pp. 19-20; ECF Doc. 13, pp. 21-24.)  In Ground Three, he challenges his conviction for aggravated murder, arguing the State failed to present sufficient evidence of prior calculation and design.  (ECF Doc. 1, pp. 21-23; ECF Doc. 13, pp. 24-29.)

Respondent argues that Grounds Two and Three are without merit and should therefore be denied.  (ECF Doc. 9, pp. 31-41; ECF Doc. 14, pp. 13-16.)

### 1. Legal Framework for Sufficiency of Evidence Claims

A "sufficiency of the evidence" claim is cognizable on federal habeas review. *See In re Winship*, 397 U.S. 358, 364 (1970). In reviewing such a claim, the relevant inquiry is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original).

In assessing the sufficiency of the evidence, a court does "not reweigh the evidence, re-evaluate the credibility of witnesses, or substitute [its] judgment for that of the jury." *Brown v. Konteh*, 567 F.3d 191, 205 (6th Cir. 2009). This "inquiry does not focus on whether the trier of fact made the correct guilt or innocence determination, but rather whether it made a *rational* decision to convict or acquit." *Herrera v. Collins*, 506 U.S. 390, 402 (1993) (emphasis in original). "Circumstantial evidence alone is sufficient to support a conviction, and it is not necessary for the evidence to exclude every reasonable hypothesis except that of guilt." *Johnson v. Coyle*, 200 F.3d 987, 992 (6th Cir. 2000) (internal citations, quotations, and alterations omitted); *see also Durr v. Mitchell*, 487 F.3d 423, 449 (6th Cir. 2007) ("circumstantial evidence is entitled to equal weight as direct evidence").

On federal habeas review, an additional layer of deference applies to questions regarding the sufficiency of the evidence. *Coleman v. Johnson*, 566 U.S. 650, 651 (2012). "First, deference should be given to the trier-of-fact's verdict, as contemplated by *Jackson*; [and] second, deference should be given to the [state court's] consideration of the trier-of-fact's verdict, as dictated by AEDPA.'" *Davis v. Lafler*, 658 F.3d 525, 531 (6th Cir. 2011) (quoting *Tucker v. Palmer*, 541 F.3d 652, 656 (6th Cir. 2008)). The Sixth Circuit has explained the two-step deferential analysis as follows:

> First, we must ask whether the evidence itself was sufficient to convict under
> Jackson. The inquiry ends if the panel determines that there was sufficient evidence
> to convict [the petitioner].  If we find that the evidence is insufficient to convict,
> we must then apply AEDPA deference and ask whether the state court was
> "objectively unreasonable" in concluding that a rational trier of fact could find
> [petitioner] guilty beyond a reasonable doubt.

*Stewart v. Wolfenbarger*, 595 F.3d 647, 653 (6th Cir. 2010).  Thus, even if this Court were "to

conclude that a rational trier of fact could *not* have found a petitioner guilty beyond a reasonable

doubt, on habeas review, [the Court] must still defer to the *state appellate court's* sufficiency

determination as long as it is not unreasonable."  *Brown*, 567 F.3d at 205 (citing 28 U.S.C. §

2254(d)(2)) (emphasis in original)*; see also White v. Steele*, 602 F.3d 707, 710 (6th Cir. 2009).

Consistent with the foregoing framework, the undersigned turns to Mr. Jefferson's

sufficiency of the evidence claims in Grounds Two and Three.

**2.     The Evidence was Sufficient to Support a Conviction for Aggravated
         Burglary and the State Court's Adjudication was Not Unreasonable**

In Ground Two, Mr. Jefferson argues there was insufficient evidence to convict him of

aggravated burglary because the State failed to present sufficient evidence to establish that he

used force to enter the motel room.[11]  (ECF Doc. 1, pp. 19-20; ECF Doc. 13, pp. 21-24.)

On direct appeal, the state court of appeals outlined the sufficiency of the evidence

standard relating to his aggravated burglary conviction as follows:

> {¶52} On review for sufficiency, a reviewing court is to examine the evidence at
> trial to determine whether such evidence, if believed, would support a conviction.
> *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991). "The relevant inquiry is
> whether, after viewing the evidence in a light most favorable to the prosecution,
> any rational trier of fact could have found the essential elements of the crime proven

---

[11]Mr. Jefferson also argues in his Traverse there was insufficient evidence that he entered the motel room by stealth
or deception. (ECF Doc. 13, pp. 22-23.)  The undersigned declines to address these arguments, which were raised
for the first time in his Traverse.  *See Tyler v. Mitchell*, 416 F.3d 500, 504 (6th Cir. 2005).  Further, the applicable
aggravated burglary statute requires evidence of force, stealth, *or* deception. *Jefferson*, 2022-Ohio-3448, 2022 WL
4545848, at *8, ¶ 54.  Because the undersigned concludes that Mr. Jefferson's arguments regarding insufficient
evidence of force lack merit, it is unnecessary to resolve any additional arguments regarding stealth or deception.

33

beyond a reasonable doubt." *Jenks* at paragraph two of the syllabus, following *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

*Jefferson*, 2022-Ohio-3448, 2022 WL 4545848, at *8, ¶ 52.  The court addressed the argument that there was insufficient evidence to support a conviction for aggravated burglary as follows:

> {¶53} Appellant was convicted of aggravated burglary in violation of R.C. 2911.11(A)(1) and 2911.11(B). R.C. 2911.11 states, in relevant part, as follows:

> {¶54} (A) No person, by force, stealth, or deception, shall trespass in an occupied structure or in a separately secured or separately occupied portion of an occupied structure, when another person other than an accomplice of the offender is present, with purpose to commit in the structure or in the separately secured or separately occupied portion of the structure any criminal offense, if any of the following apply:

> {¶55} (1) The offender inflicts, or attempts or threatens to inflict physical harm on another;

> {¶56} (2) The offender has a deadly weapon or dangerous ordnance on or about the offender's person or under the offender's control.

> {¶57} R.C. 2901.01 (A) defines force as meaning "any violence, compulsion, or constraint physically exerted by any means upon or against a person or thing".

> {¶58} While appellant does not dispute that his entrance into the motel room was uninvited and without permission and thus the element of trespass was met, he specifically argues that there was no evidence that he entered the motel room by force, stealth or deception.

> {¶59} However, at the trial, there was testimony that the surveillance video from the motel showed a muzzle flash when appellant began shooting before he entered the room. There was testimony that about 1:32 a.m. and 50 seconds, appellant shot in the room before entering it. Three shell casings were found outside on the sidewalk. We find therefore, that there was sufficient evidence that appellant trespassed, by force, purposely entering the motel room, an occupied structure, shooting his way in, and when he inflicted harm by a deadly weapon. Appellant, by force, trespassed into an occupied structure.

> {¶60} We find, therefore, that appellant's conviction for aggravated burglary was supported by sufficiency of the evidence.

*Jefferson*, 2022-Ohio-3448, 2022 WL 4545848, at *8, ¶¶ 53-60.[12]

---

[12] In the same assignment of error, Mr. Jefferson also argued that his conviction for aggravated murder lacked the support of sufficient evidence because it was based on the commission of aggravated burglary. *Jefferson*, 2022-

34

In challenging the state court's sufficiency finding, Mr. Jefferson criticizes the quality of some of the evidence relied on by the court, describing the testimony regarding a "muzzle flash" before Mr. Jefferson entered the hotel room as follows: "Det. Perry, who[] reviewed a dark and grainy video from the motel's surveillance camera, asserted before the jury, that backlighting in the video were to be considered muzzle flashes from a gun." (ECF Doc. 1, p. 19.) Based on this description, he argues "there is no evidentiary basis that Petitioner used the gun to gain entrance to the motel room." (*Id.* at p. 20.) He also highlights other evidence that he believes supports a finding that he did not enter the hotel room by force, including:

> Testimony from Wade, admitted that Nabors opened the door and backed away from the doorway. She also stated that she heard Nabors making the comment, "You got it, you got it" then Petitioner began to enter the room at this point. Wade did not testify to seeing Petitioner or a gun before Petitioner entered the room.

> Furthermore, Petitioner testified that Nabors "jumped at him" and out of fear for his life at that point he started shooting. The shooting of Nabors and Petitioner entering the motel room are not in correlation of each other and thus, does not provide factual basis proving the essential element of force to support the aggravated burglary conviction.

(*Id.*) Ultimately, Mr. Jefferson argues that "Nabors opened the door without any threat of harm, compulsion to do so, or any form of constraint to open the door" and Mr. Jefferson "merely walked through the doorway." (ECF Doc. 1, p. 20; ECF Doc. 13, p. 22.) On this basis, he asserts that "the state failed to prove beyond reasonable doubt that Petitioner used the element of force to gain entry into the motel room as defined under R.C. 2901.02(A)." (ECF Doc. 1, p. 20.)

In considering Mr. Jefferson's argument, this Court must be mindful of the fact that it may not "reweigh the evidence, re-evaluate the credibility of witnesses, or substitute [its] judgment for that of the jury." *Brown*, 567 F.3d at 205. That is because "it is the responsibility

---

Ohio-3448, 2022 WL 4545848, at *8, ¶ 51. "Having found that appellant's conviction for aggravated burglary was supported by sufficient evidence," the state appellate court also found that "his conviction for aggravated murder based on his commission of the offense of aggravated burglary was supported by sufficient evidence." *Id.* at ¶ 61.

of the jury—not the court—to decide what conclusions should be drawn from evidence admitted at trial." *Coleman*, 566 U.S. at 651 (internal quotations and citations omitted).  Thus, it is irrelevant whether this Court might weigh the evidence highlighted by Mr. Jefferson differently from the jury.  The question here is simply whether the jury "made a *rational* decision" when it concluded that Mr. Jefferson entered the motel room through the use of force.  *See Herrera*, 506 U.S. at 402 (emphasis in original).  The evidence shows that it did.

While Mr. Jefferson argues there was "no evidentiary basis that [he] used the gun to gain entrance to the motel room" (ECF Doc. 1, pp. 19-20), he also acknowledges Detective Perry's testimony that a surveillance video showed what he considered to be "muzzle flashes from a gun," (*Id.* at p. 19).  The state court also noted that three shell casings were found outside of the hotel room, *Jefferson*, 2022-Ohio-3448, ¶ 59, a fact that was not rebutted by Mr. Jefferson.  While Mr. Jefferson might weigh the evidence presented at trial differently, the jury considered that evidence and evaluated the testimony and credibility of all witnesses—including Detective Perry, Ms. Wade, and Mr. Jefferson—before it found Mr. Jefferson had entered the motel room through force.  (ECF Doc. 9-3, p. 2; 9-4, p. 2; ECF Doc. 9-5, p. 2.)  Deference is due to the jury's determination, *Brown*, 567 F.3d at 205, and Mr. Jefferson has failed to show that "no rational trier of fact could have agreed with the jury" on this issue.  *Coleman*, 566 U.S. at 651.

If the Court agrees with the undersigned that the jury made a rational decision in finding Mr. Jefferson entered the hotel room by force, it need not address the second layer of deference applied to sufficiency of the evidence claims on federal habeas review.  *See Stewart*, 595 F.3d at 653.  Under that second layer, the question before the Court is "whether the Ohio Court of Appeals itself was unreasonable in *its* conclusion that a rational trier of fact could find [Mr. Jefferson] guilty beyond a reasonable doubt based upon the evidence introduced at trial."

36

*Brown*, 567 F.3d at 205 (emphasis in original). To prevail under this standard, Mr. Jefferson "'must show that the state court's ruling on [his] [sufficiency] claim . . . was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" *Bobby*, 565 U.S. at 24 (quoting *Harrington*, 562 U.S. at 103). "[E]ven a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Harrington*, 562 U.S. at 102.

Here, Mr. Jefferson presented similar arguments in his habeas petition and his direct appeal. (*See* ECF Doc. 13, pp. 21-24; ECF Doc. 9-1, p. 70.) The state appellate court considered those arguments and the evidence presented at trial, and found no merit in the argument that there was insufficient evidence of entry by force. *See Jefferson*, 2022-Ohio-3448, 2022 WL 4545848, at *8, ¶¶ 58-60. This finding was consistent with the standard in *Jackson*, which established that "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." 443 U.S. at 319 (emphasis in original). Having considered the reasoned analysis of the state court of appeals, and given the record before the state court of appeals, the undersigned concludes that it cannot be said that the "'state court's ruling on [his] [sufficiency] claim . . . was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" *Bobby*, 565 U.S. at 24 (quoting *Harrington*, 562 U.S. at 103).

### 3. The Evidence was Sufficient to Support the Conviction for Aggravated Murder and the State Court's Adjudication was Not Unreasonable

In Ground Three, Mr. Jefferson asserts there was insufficient evidence to convict him of aggravated murder, arguing the State failed to present sufficient evidence of prior calculation and design. (ECF Doc. 1, pp. 21-23; ECF Doc. 13, pp. 24-29.)

37

Having already outlined the sufficiency of the evidence standard, *Jefferson*, 2022-Ohio-3448, ¶ 52, the court of appeals addressed his argument that there was insufficient evidence to support his conviction for aggravated murder as follows:

{¶64} Appellant was convicted of aggravated murder in violation of R.C. 2903.01(A) which states as follows: "[n]o person shall purposely, and with prior calculation and design, cause the death of another or the unlawful termination of another's pregnancy".

{¶65} Appellant contends that the evidence was insufficient to show prior calculation and design. The Ohio Supreme Court held it is not possible to formulate a bright-line test to distinguish between the presence or absence of prior calculation and design, but instead each case turns on the particular facts and evidence presented at trial. *State v. Taylor*, 78 Ohio St.3d 15, 20, 1997-Ohio-243, 676 N.E.2d 82. In *Taylor v. Mitchell*, 296 F.Supp.2d 784 (2003), the habeas corpus action considered by the U.S. Northern District of Ohio Federal Court regarding the conviction reviewed by the Ohio Supreme Court in *Taylor*, *supra*, the federal court summarized Ohio law regarding prior calculation and design as follows:

{¶66} In view of the understandable lack of a bright line rule governing determinations of whether the proof shows prior calculation and design, Ohio courts have consistently considered various factors in addition to those - the defendant's relationship with the victim, the thought given by the defendant to the means and place of the crime, and the timing of the pertinent events - recited in *Taylor*, 78 Ohio St.3d at 19, 676 N.E.2d 82, when determining whether the defendant engaged in prior calculation and design.

{¶67} Among these other, frequently considered factors are:

{¶68} —whether the defendant at any time expressed an intent to kill.

{¶69} —there was a break or interruption in the encounter, giving time for reflection.

{¶70} —whether the defendant displayed a weapon from the outset.

{¶71} —whether the defendant retrieved a weapon during the encounter.

{¶72} —the extent to which the defendant pursued the victim.

{¶73} —the number of shots fired.

{¶74} *Id.* at 821–822, internal citations omitted.

38

{¶75} The state can prove "prior calculation and design" from the circumstances surrounding a murder in several ways, including: (1) "evidence of a preconceived plan leading up to the murder"; (2) "evidence of the [defendant's] encounter with the victim, including evidence necessary to infer that the defendant had a preconceived notion to kill regardless of how the [events] unfolded" or (3) "evidence that the murder was executed in such a manner that circumstantially proved the defendant had a preconceived plan to kill," such as where the victim is killed in a cold-blooded, execution-style manner. *State v. Hicks*, 8th Dist. Cuyahoga No. 102206, 2015-Ohio-4978, ¶ 40.

{¶76} In the case sub judice, there was sufficient evidence to support a finding of prior calculation and design by appellant in the aggravated murder of Nabors. Appellant was aware that Wade was with another man and tracked her via GPS to the motel. He was angry that Wade was with another man and went to the motel with his gun and a knife. The gun was a .40 caliber semi-automatic. In order to get to the motel, he had to borrow a vehicle from his mother since Wade had taken the only family vehicle. After getting to the motel, where he was for approximately eight minutes the first time, appellant paced outside of the motel room then left for eight minutes. During such time, appellant drove around and then returned. As noted by appellee, this gave him time for reflection and consideration of his actions. Appellant, upon his return, slashed the victims' tires and waited some more. He testified that he stood outside the motel room and heard them having sex. Appellant had his gun on him at the time. He waited at the motel for over 25 minutes before the door to the room was opened and when the door was opened, he immediately opened fire. Nabors fell after being shot and crawled away from appellant, but appellant followed him into the room and continued shooting. Nabors was shot a total of seven times, including shot to the back of the head while he was on the floor.

{¶77} We find that there was sufficient evidence establishing prior calculation and design and that appellant's conviction for aggravated murder was not against the sufficiency of the evidence.

*Jefferson*, 2022-Ohio-3448, 2022 WL 4545848, at *9-10, ¶¶ 64-77.

Mr. Jefferson acknowledges that Ohio does not have a bright-line rule to assess prior calculation and design, instead requiring a fact-specific determination, but argues that insufficient evidence was presented at trial to support the prior calculation and design element of his aggravated murder conviction because "the totality of circumstances amounts to a random meeting and an instantaneous eruption of events." (ECF Doc. 13, pp. 25-26, 28.)  In support, he offers his own interpretation of how the evidence aligns with the three elements discussed by the

39

Ohio Supreme Court in *State v. Taylor*, 78 Ohio St.3d 15.  (ECF Doc. 1, p. 22; ECF Doc. 13, pp. 26-28.)  As to the first element—the defendant's relationship with the victim—he argues there is no evidence that he and the victim knew one another.  (*Id.*)  As to the second element—the thought the defendant gave to the means and place of the crime—he argues Ms. Wade lied to him about where she was going, that she chose the hotel location, and that Mr. Jefferson always carried a gun.  (*Id.*)  And as to the third element—the timing of pertinent events—he acknowledges that he left the scene and later returned, but argues "there was no evidentiary basis for concluding" that he used that time to reflect and plan; he further asserts that the situation involved "an instantaneous eruption of events" that began when Mr. Nabors "opened the motel room door and jumped at Petitioner."  (*Id.*)

As discussed above, this Court may not "reweigh the evidence, re-evaluate the credibility of witnesses, or substitute [its] judgment for that of the jury," *Brown*, 567 F.3d at 205, and should consider instead whether the jury "made a *rational* decision" when it concluded that Mr. Jefferson exhibited prior calculation and design, *see Herrera*, 506 U.S. at 402 (emphasis in original).  The supporting facts in evidence, which were identified by the state court of appeals and not rebutted by clear and convincing evidence by Mr. Jefferson, included: (1) as to the first *Taylor* element, the fact that Petitioner "was aware that [Ms.] Wade was with another man," "was angry that [she] was with another man," and "stood outside the motel room and heard [the victims] having sex"; (2) as to the second *Taylor* element, the fact that Petitioner "tracked [Ms. Wade] via GPS to the motel," "had to borrow a vehicle" to go to the motel, and "went to the motel with his gun and a knife"; and (3) as to the third *Taylor* element, the fact that Petitioner "paced outside of the motel room then left for eight minutes . . . and then returned," then "slashed the victims' tires and waited some more," then "waited at the motel for over 25 minutes

40

before the door to the room was opened," at which point "he immediately opened fire." *Jefferson*, 2022-Ohio-348, ¶ 76. Mr. Jefferson also "followed Mr. Nabors into the room and continued shooting," as Mr. Nabors crawled away, ultimately shooting Mr. Nabors "a total of seven times, including a shot to the back of the head while he was on the floor." *Id.*

Since the jury considered all of the evidence and evaluated the testimony and credibility of all witnesses, including Mr. Jefferson (*see* ECF Doc. 9-5, p. 2), deference is due to its conclusion that the evidence proved Mr. Jefferson's prior calculation and design, *Brown*, 567 F.3d at 205. Mr. Jefferson has failed to demonstrate on federal habeas review that "no rational trier of fact could have agreed with the jury" on this issue. *Coleman*, 566 U.S. at 651.

If the Court agrees that the jury made a rational decision in finding the evidence showed prior calculation and design, it need not address the second layer of deference applied to sufficiency claims. *See Stewart*, 595 F.3d at 653. Under that second layer, the question before this Court is, again, "whether the Ohio Court of Appeals itself was unreasonable in *its* conclusion that a rational trier of fact could find [Mr. Jefferson] guilty beyond a reasonable doubt based upon the evidence introduced at trial." *Brown*, 567 F.3d at 205 (emphasis in original).

As with Ground Two, the court of appeals here considered arguments that mirror Mr. Jefferson's arguments on federal habeas review (*compare* ECF Doc. 13, pp. 26-29 *with* ECF Doc. 9-1, pp. 72-73), reviewed the evidence presented at trial, and found Petitioner's contention that there was insufficient evidence of prior calculation and design to be without merit, *Jefferson*, 2022-Ohio-3448, ¶¶ 58-60. That finding was supported by evidence in the trial record that showed, for example, that Mr. Jefferson admitted to: tracking Ms. Wade's location to the motel; having his gun with him; being aware she was there with another person and being mad about it; slashing Ms. Wade's and Mr. Nabor's tires; standing outside the motel room for twenty-five

minutes while hearing her have sex with the other person; then shooting Mr. Nabors seven times once the motel door opened, including once in the face and once in the back of the head.  (*See* ECF Doc. 9-5, pp. 18, 19-20, 30, 37-38, 40-42, 48-50.)  Further, while Mr. Jefferson asserts that there was "no evidentiary basis for concluding" that he reflected on a plan or scheme to kill Mr. Nabors when he left the motel to drive around for eight minutes and then returned (ECF Doc. 13, p. 28), the Sixth Circuit has made it clear that "[c]ircumstantial evidence alone is sufficient to support a conviction[.]" *Johnson*, 200 F.3d at 992; *see also Durr*, 487 F.3d at 449.  Thus, the state appellate court's conclusion that Mr. Jefferson had "time for reflection and consideration of his actions" when he left the motel and drove around for eight minutes, *Jefferson*, 2022-Ohio-3448, ¶ 76, was not an unreasonable determination of the facts in light of the evidence.

Under *Jackson*, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  443 U.S. at 319 (emphasis in original).  Having considered the reasoned analysis of the state court of appeals, and given the record before the state court of appeals, the undersigned concludes that it cannot be said that the "'state court's ruling on [his] [sufficiency] claim . . . was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'"  *Bobby*, 565 U.S. at 24 (quoting *Harrington*, 562 U.S. at 103).[13]

For the reasons set forth above, the undersigned recommends that the Court **DENY** Grounds Two and Three on the merits.

---

[13] Without directly arguing that the state court misapplied Ohio's prior calculation and design standard, Mr. Jefferson argues in his Traverse that the current prior calculation and design standard is more rigorous than Ohio's prior premeditation standard.  (ECF Doc. 13, p. 25.)  To the extent he intends to argue that the state court misapplied Ohio law, his argument is underdeveloped and waived, *see McPherson v. Kelsey*, 125 F.3d 989, 995 (6th Cir. 1997), and without merit on habeas review because "it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions," *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) (citing 28 U.S.C. § 2241).

**D.      Ground Four is Not Cognizable and/or Without Merit**

In Ground Four, Mr. Jefferson argues he was denied a fair trial and due process when the trial court refused to provide a self-defense jury instruction. (ECF Doc. 1, pp. 23-25; ECF Doc. 13, pp. 29-32.) Respondent asserts that this claim should be dismissed as noncognizable on federal habeas review and/or denied as without merit. (ECF Doc. 9, pp. 41-45; ECF Doc. 14-7.)

**1.      Habeas Review of State Law Finding Regarding Jury Instruction**

"[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions. In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Estelle v. McGuire*, 502 U.S. 62, 68 (1991) (citing 28 U.S.C. § 2241); *see also Lewis v. Jeffers*, 497 U.S. 764, 780 (1990) ("[F]ederal habeas corpus relief does not lie for errors of state law."); *Engle v. Isaac*, 456 U.S. 107, 121 n.21 (1982) ("We have long recognized that a 'mere error of state law' is not a denial of due process.") (citation omitted)).

"Because 'federal habeas corpus relief does not lie for errors of state law,'" federal courts "may grant the writ based on errors in state jury instructions only in extraordinary cases." *Daniels v. Lafler*, 501 F.3d 735, 741 (6th Cir. 2007) (quoting *Lewis*, 497 U.S. at 780); *see also Bagby v. Sowders*, 894 F.2d 792, 795 (6th Cir. 1990) (explaining that, because "it is not the function of a federal habeas court to correct errors in state law," granting federal habeas relief and setting aside a conviction based on a state trial court's failure to give a jury instruction based on its interpretation of its own laws would only be warranted "under the most unusual circumstances"); *Rashad v. Lafler*, 675 F.3d 564, 569 (6th Cir. 2012) ("Generally speaking, a state court's interpretation of the propriety of a jury instruction under state law does not entitle a habeas claimant to relief.") (citing 28 U.S.C. § 2254(a); *Estelle*, 502 U.S. at 67–68).

43

Thus, "[t]o warrant habeas relief, 'jury instructions must not only have been erroneous, but also, taken as a whole, so infirm that they rendered the entire trial fundamentally unfair.  The burden is even greater than that required to demonstrate plain error on appeal.'"  *Buell v. Mitchell*, 274 F.3d 337, 355 (6th Cir. 2001).  Therefore, "the state court's refusal to give the instruction must have 'so infected the entire trial that the resulting conviction violates due process.'" *Keahey v. Marquis*, 978 F.3d 474, 478 (6th Cir. 2020) (quoting *Cupp v. Naughten*, 414 U.S. 141, 147 (1973)).

### 2.    State Court Adjudication of Jury Instruction Challenge

On direct appeal, the state appellate court addressed the merits of Mr. Jefferson's claim that the trial court abused its discretion by not giving a self-defense jury instruction as follows:

> {¶97} Appellant, in his fifth assignment of error, argues that the trial court abused its discretion by not instructing the jury on self-defense. We disagree.

> {¶98} Appellant, in the case sub judice, did not request a jury instruction on self-defense and did not object to the trial court's failure to give one. Crim.R. 30(A) provides that a party may not assign as error the trial court's failure to give any jury instructions "unless the party objects before the jury retires to consider its verdict, stating specifically the matter objected to and the grounds of the objection." The failure to object to a jury instruction in accordance with Crim.R. 30(A) before the jury retires constitutes a waiver, absent plain error. *State v. Lynn*, 129 Ohio St.3d 146, 950 N.E.2d 931, 2011-Ohio-2722, ¶ 12.

> {¶99} Plain error exists where there is an obvious deviation from a legal rule that affected the defendant's substantial rights by influencing the outcome of the proceedings. *State v. Barnes*, 94 Ohio St.3d 21, 27, 2002-Ohio-68, 759 N.E.2d 1240. "Plain error does not exist unless it can be said that but for the error, the outcome of the trial would clearly have been otherwise." *State v. Biros*, 78 Ohio St.3d 426, 436, 1997-Ohio-204, 678 N.E.2d 891. Courts should notice plain error, "with the utmost caution, under exceptional circumstances and only to prevent a miscarriage of justice." *Lynn* at ¶ 14.

> > The elements of a valid claim of self-defense are as follows: (1) the defendant was not at fault in creating the situation giving rise to the affray; (2) the defendant had a bona fide belief that he or she was in imminent danger of death or great bodily harm and that his or her only means of escape from such

44

danger was in the use of such force; and (3) the defendant did not violate any duty to retreat or avoid the danger.

{¶100} *State v. Petway,* 2020-Ohio-3848, 156 N.E.3d 467, ¶ 41 (11th Dist.), citing *State v. Barnes*, 94 Ohio St.3d 21, 24, 2002-Ohio-68, 759 N.E.2d 1240, citing *State v. Robbins*, 58 Ohio St.2d 74, 388 N.E.2d 755 (1979), paragraph two of the syllabus. Under the burden shifting framework outlined in the current version of R.C. 2901.05(B), which became effective on April 6, 2021, "the state is not required to prove the defendant did not act in self-defense until that defendant introduces evidence that tends to support they acted in self-defense." *State v. Walker,* 2021-Ohio-3860, 180 N.E.3d 60, ¶ 61 (6th Dist.), citing *Petway* at ¶ 55. Thus, "the defendant maintains the burden of production on their self-defense claim before the state inherits the burden of persuasion." *Id.*

{¶101} The trial court, in indicating that it would not be giving an instruction on self-defense, stated, in relevant part, as follows:

> [I]n listening to Mr. Jefferson's testimony, I would not be giving them the self-defense instruction. I don't think it's warranted, because to do that you have to say evidence was presented in support of finding that the Defendant used force in self-defense. There was no testimony whatsoever that Mr. Jefferson had any reason to believe that he was in imminent danger of death. He only said that Mr. Nabors might have made a step towards him, and, at that point, that's when he said he started shooting. For that reason, I would not be giving them that instruction regarding self-defense because I don't think it's warranted because I don't think there was any evidence regarding self-defense.

{¶102} Trial Transcript at 656-657. Appellant testified at trial that when the motel room door opened, and Nabors saw him, Nabors stepped back and raised his arms. At the time, appellant had a loaded gun in his hand and Nabors and Wade were unarmed. There was testimony at trial that appellant began immediately firing his gun when the door to the motel room opened.

{¶103} We concur with the trial court and find no plain error in not giving an instruction on self-defense.

*Jefferson*, 2022-Ohio-3448, ¶¶ 97-104, 2022 WL 4545848, at *11-12.

### 3. Claim in Ground Four is Not Cognizable and/or Without Merit

Mr. Jefferson argues the trial court's "refus[al] to give self-defense instruction was an unreasonable determination of facts in light of the evidence presented at trial" and "was a denial

45

of [his] constitutional right to present a complete defense in violation of . . . due process" as described in *Crane v. Kentucky*, 476 U.S. 683, 690 (1986).  (ECF Doc. 13, p. 32.)

To the extent Mr. Jefferson is seeking federal habeas relief because the trial court's failure to instruct the jury on self-defense violated state law, he fails to state a claim upon which federal habeas relief may be granted.  As explained above, "it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions." *Estelle*, 502 U.S. at 67-68.  Accordingly, to the extent Ground Four is based on asserted violations of state law, the undersigned recommends that the Court **DENY** that claim as not cognizable.

Mr. Jefferson correctly observes that his jury instruction claim may be cognizable on federal habeas review if the "ailing instruction by itself so infected the entire trial that the resulting conviction violates due process."  (ECF Doc. 13, p. 29 (citing *Cupp*, 414 U.S. at 147).)  In support of such a finding, he notes that Mr. Nabors was a larger man and had keys clenched in his hand when he died, and also cites to his own trial testimony:

Q.      You shot Dwayne Nabors.  Correct?

A.      Obviously, I did, but I wasn't aiming to shoot Dwayne.

Q.      He was the first one coming out the door?

A.      He opened the door.

Q.      Correct.  And you didn't have a conversation with him.  Actually, at 1:32 and some seconds, we see you stand back in the position to fire and we see the flashes.  You fired from outside, from the jump, correct?

A.      No.

Q.      Oh, you had what?  A five-minute conversation with him?  Hi, how are you doing, you got towels?

A.      It wasn't a five-minute conversation.  He opened up the door.  He stepped back, saying, "Hey, you got it."  He was smiling.  I was looking at him.  I took my eyes off of him and was looking at Shaylee.  She was looking at him smiling --

Q.      All while you're standing outside the door this is going on?

46

THE COURT: Let him finish his answers.  Just let him finish.

Q.      All of that.

A.      That's what happened.  Then in the process of me looking at Shaylee, Dwayne, like, jumped towards me.  That's when I fired the first shot.  And then after that, I just lost it.

* * *

Q.      Okay.  So shooting Dwayne Nabors and shooting Shaylee Wade, it was all an accident.  Correct?

A.      I was scared when I seen Dwayne jump at me, so that's when I just started shooting.

* * *

A.      When he opened the door --

Q.      Answer my question, sir.

A.      I am.  He threw up his hands like this, and he said, "Hey, hey, hey, you got it."  And then he was smiling.  And I looked at Shaylee and she was looking at him and she was smiling, and I just felt -- like, I felt horrible.  And then while I'm looking at Shaylee, in that second, he, with his right foot, jumped towards the door, and that's what scared me to cause me to start shooting.  Then as I went in, I was still shooting . . . .

(ECF Doc. 9-5, pp. 43-45; *see* ECF Doc. 13, pp. 30-31.)  Mr. Jefferson, who waited outside the motel room with a gun for 25 minutes after slashing both victims' tires, and watched Mr. Nabors open the door, step back, say "hey, you got it," and then smile at Ms. Wade as she smiled back at him, nevertheless contends that a self defense instruction was required because Mr. Nabors then jumped towards Mr. Jefferson and/or the door right before Mr. Jefferson opened fire.  (*Id.*)

In declining to give a jury instruction on self defense, the trial court acknowledged Mr. Jefferson's statements that "Mr. Nabors might have made a step towards him, and, at that point, that's when he said he started shooting," but concluded "[t]here was no testimony whatsoever that Mr. Jefferson had any reason to believe that he was in imminent danger of death." *Jefferson*, 2022-Ohio-3448, ¶ 101.  Given the evidence presented at trial, including Mr. Jefferson's own

testimony, the undersigned finds Mr. Jefferson has failed to demonstrate that the trial court's decision not to instruct the jury on self-defense was "so infirm that [it] rendered the entire trial fundamentally unfair." *Buell*, 274 F.3d at 355 (citation and internal quotation marks omitted).

Although this failing alone is sufficient to deny relief, the undersigned observes that the claim for relief set forth in Ground Four must also fail for several additional reasons.

First, to the extent that Mr. Jefferson seeks relief because the trial court's "refus[al] to give self-defense instruction was an unreasonable determination of facts in light of the evidence presented at trial" under 28 U.S.C. § 2254(d)(2) (ECF Doc. 13, p. 32), the Sixth Circuit recently explained that an argument that a failure to provide a self-defense jury instruction violates a defendant's constitutional rights "presents a mixed question of law and fact that falls under § 2254(d)(1), not under § 2254(d)(2)." *Mercer v. Stewart*, 171 F.4th 897, 904 (6th Cir. 2026). Thus, any claim for relief under § 2254(d)(2) in Ground Four must fail.

Second, to the extent Mr. Jefferson seeks relief under 28 U.S.C. § 2254(d)(1) because the lack of a self-defense jury instruction amounted to "a denial of [his] constitutional right to present a complete defense in violation of . . . due process" as described in *Crane*, 476 U.S. at 690 (ECF Doc. 13, p. 32), he has failed to show that the state appellate court's decision was contrary to or an unreasonable application of clearly established federal law. While the Supreme Court in *Crane* did state that "the Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense,'" 476 U.S. at 690 (quoting *California v. Trombetta,* 467 U.S. 479, 485 (1984)), the Court held more specifically that the exclusion of testimony regarding the circumstances of a defendant's confession of guilt "deprived him of a fair trial," *id.* at 690. The Supreme Court's ruling in *Crane* did not address the impact of a decision to exclude a self-defense jury instruction at trial. Accordingly, Mr. Jefferson has failed to demonstrate that

48

the state court's jury instruction determination was contrary to or an unreasonable application of federal law as established in *Crane*.

In *Keahey v. Marquis*, 978 F.3d 474 (6th Cir. 2020), the Sixth Circuit acknowledged the *Crane* standard and the existence of a "narrow category of state jury-instruction mistakes that violate the clearly established right to 'fundamental fairness,'" but found a federal habeas claim based on a failure to give a self-defense jury instruction was not contrary to clearly established federal law under § 2254(d)(1) because "the Supreme Court, regrettably for Keahey, has never invoked this principle in granting relief for the failure to give a self-defense instruction." *Id.* at 478 (citations omitted).  The court further found the failure was not an unreasonable application of federal law under § 2254(d)(1) "[b]ecause the Supreme Court has never clearly established [petitioner]'s alleged constitutional right to a self-defense instruction and because the state court did not unreasonably apply the most relevant Supreme Court holdings." *Id.* at 479.  The Sixth Circuit recently reiterated its finding that no relief is available under § 2254(d)(1) based on a failure to give a self-defense jury instruction.  *See Mercer*, 171 F.4th at 907 (discussing *Keahey*). This precedent further demonstrates that Mr. Jefferson's claim in Ground Four lacks merit.

For all of the reasons set forth above, the undersigned recommends that the Court **DENY** Mr. Jefferson's federal constitutional claim in Ground Four on the merits.

### E.      Ground Five Was Procedurally Defaulted

In Ground Five, Mr. Jefferson argues that he received constitutionally ineffective assistance of counsel when his appellate attorney did not assert a claim for ineffective assistance of trial counsel on direct appeal, challenging his trial counsel's failure to assert a "for cause" or preemptory challenge to remove Juror #7 for bias.  (ECF Doc. 1, pp. 26-27; ECF Doc. 13, pp. 32-36.)  Juror #7 told the trial court that she overheard "[a] girl that works at the same place as I

do" who had the last name Nabors "telling somebody else that her dad's murder trial was this week." (ECF Doc. 9-2, p. 47.)  The juror said she did not know Ms. Nabors personally and did not "really talk to her" but "said hi in passing."  (*Id.* at pp. 46-47.)  The juror also said she could "be fair and impartial" but when asked "would you believe [Ms. Nabors] or not believe her" if she was a witness, the juror stated: "I guess I think I probably would believe her, but I don't know her besides in passing."  (*Id.* at pp. 47-49.)  Mr. Jefferson asserts that the juror's answers to the court's questions "show[] that juror's bias exists and should have been grounds for a reasonable defense attorney to raise a challenge for the juror's removal."[14]  (ECF Doc. 13, p. 26.)  Respondent notes that Ms. Nabors "was never called to testify" and argues that Ground Five should be dismissed as procedurally defaulted.  (ECF Doc. 9, pp. 46-49.)

### 1.      Legal Standard for Procedural Default

A federal court may not grant a writ of habeas corpus unless the petitioner has exhausted all available remedies in state court.  *See* 28 U.S.C. § 2254(b)(1)(A).  A state defendant with federal constitutional claims must fairly present those claims to the state courts before raising them in a federal habeas corpus action.  *See* 28 U.S.C. §§ 2254(b), (c); *Anderson v. Harless*, 459 U.S. 4, 6 (1982) (per curiam); *Picard v. Connor*, 404 U.S. 270, 275-76 (1971); *see also Fulcher v. Motley*, 444 F.3d 791, 798 (6th Cir. 2006) ("Federal courts do not have jurisdiction to consider a claim in a habeas petition that was not 'fairly presented' to the state courts").

To satisfy the fair presentation requirement, a habeas petitioner must present both the facts and legal theories underpinning his claims to the state courts.  *See McMeans v. Brigano*, 228 F.3d 674, 681 (6th Cir. 2000).  This means that the petitioner must present his claims to the

---

[14] Mr. Jefferson also asserts without factual or legal support that this Court "should presume that Juror [#7] lied about her personal knowledge of the case and her close relationship with the victim's daughter to secure her a chair with the jury[.]" (ECF Doc. 1, p. 27.)  The undersigned makes no such presumption.

state courts as federal constitutional issues and not merely as issues arising under state law. *See, e.g.*, *Baldwin v. Reese*, 541 U.S. 27, 33-34 (2004); *Franklin v. Rose*, 811 F.2d 322, 324-25 (6th Cir. 1987). A constitutional claim for relief must also be presented to the state's highest court to satisfy the fair presentation requirement. *See O'Sullivan v. Boerckel*, 526 U.S. 838, 845-48 (1999); *Hafley v. Sowders*, 902 F.2d 480, 483 (6th Cir. 1990).

A petitioner must also meet certain procedural requirements to have his claims reviewed in federal court. *See Smith v. State of Ohio Dep't of Rehab. & Corr.,* 463 F.3d 426, 430 (6th Cir. 2006). "Procedural barriers, such as . . . rules concerning procedural default and exhaustion of remedies, operate to limit access to review on the merits of a constitutional claim." *Daniels v. United States*, 532 U.S. 374, 381 (2001). Although procedural default is sometimes confused with exhaustion, exhaustion and procedural default are distinct. *See Williams v. Anderson*, 460 F.3d 789, 806 (6th Cir. 2006). Failure to exhaust applies where state remedies are "still available at the time of the federal petition." *Id.* at 806 (quoting *Engle*, 456 U.S. at 125 n.28). In contrast, procedural default applies where state court remedies are no longer available. *See id.*

Procedural default may occur in two ways. First, a petitioner may procedurally default a claim if he fails "to comply with state procedural rules in presenting his claim to the appropriate state court." *Id.* In *Maupin v. Smith,* the Sixth Circuit articulated a four-prong analysis to be used when determining whether a claim is procedurally barred due to failure to comply with a state procedural rule: (1) whether there is a state procedural rule applicable to petitioner's claim, and whether petitioner failed to comply with that rule; (2) whether the state court enforced the procedural rule; (3) whether the state procedural rule is an adequate and independent state ground on which the state can foreclose review of the federal constitutional claim; and (4) whether the petitioner can demonstrate cause for his failure to follow the rule and that he was

51

actually prejudiced by the alleged constitutional error.  785 F.2d 135, 138 (6th Cir. 1986); *see also Williams*, 460 F.3d at 806 ("If, due to the petitioner's failure to comply with the procedural rule, the state court declines to reach the merits of the issue, and the state procedural rule is an independent and adequate grounds for precluding relief, the claim is procedurally defaulted.") (citing *Maupin*, 785 F.2d at 138).

Second, "a petitioner may procedurally default a claim by failing to raise a claim in state court, and pursue that claim through the state's 'ordinary appellate review procedures.'"  *See Williams*, 460 F.3d at 806 (quoting *O'Sullivan*, 526 U.S. at 848); *see also Baston v. Bagley*, 282 F. Supp. 2d 655, 661 (N.D. Ohio 2003) ("Issues not presented at each and every level [of the state courts] cannot be considered in a federal habeas corpus petition."); *State v. Moreland*, 50 Ohio St.3d 58, 62 (1990) (finding failure to present a claim to a state court of appeals constituted a waiver).  "If, at the time of the federal habeas petition, state law no longer allows the petitioner to raise the claim, the claim is procedurally defaulted." *Williams*, 460 F.3d at 806.  Thus, even if the exhaustion requirement is technically satisfied because no state remedies remain available to the petitioner, the petitioner's prior failure to present those claims for consideration in state court may cause a procedural default that bars federal court review of the claims.  *See id.* (citing *Coleman v. Thompson,* 501 U.S. 722, 732 (1991)).

To overcome procedural default, a petitioner must: (1) show cause for the default and demonstrate that actual prejudice resulted from the alleged violation of federal law; or (2) show that there will be a fundamental miscarriage of justice if the claims are not considered. *See Coleman*, 501 U.S. at 750.  "A fundamental miscarriage of justice results from the conviction of one who is 'actually innocent.'" *Lundgren v. Mitchell*, 440 F.3d 754, 764 (6th Cir. 2006) (quoting *Murray v. Carrier*, 477 U.S. 478, 496 (1986)).

52

### 2.    Ground Five Was Procedurally Defaulted

The first way a petitioner may procedurally default is by failing "to comply with state procedural rules in presenting his claim to the appropriate state court." *See Williams*, 460 F.3d at 806.  Respondent argues that the claim in Ground Five was procedurally defaulted because Mr. Jefferson did not timely challenge appellate counsel's failure to raise that claim.  (ECF Doc. 9, pp. 46-47.)  Mr. Jefferson argues that he "properly raised the issue at his first opportunity in his App.R.26(B) [motion], thus exercising due diligence."  (ECF Doc. 13, p. 35.)

The record reflects that Mr. Jefferson did attempt to raise his claim for ineffective assistance of appellate counsel through a motion for leave to file a motion for reopening pursuant to App. R. 26(B).  (ECF Doc. 9-1, pp. 187-88; *see also id.* at pp. 189-95.)  The Ohio appellate court denied Mr. Jefferson's motion for leave to file a motion for reopening under App. R. 26(B), noting that the application was filed after the 90-day deadline.  (*Id*. at pp. 208-11.)  The court found the motion did not provide a sufficient explanation to establish good cause for the delay, and further found Mr. Jefferson's juror bias argument was undermined by his acknowledgment that he was aware of the juror bias issue at the time of trial, before the direct appeal.  (*Id.*)

To assess procedural default based on a failure to comply with state procedural rules, courts in this circuit apply the four-prong *Maupin* analysis.  *See Williams*, 460 F.3d at 807 (citing *Maupin*, 785 F.2d at 138).  Under the first two prongs of the *Maupin* analysis, this Court must determine whether Mr. Jefferson failed to comply with a procedural rule and whether the state enforced that rule. *See* 785 F.2d at 138.  Ohio appellate rules provided that: "An application for reopening shall be filed in the court of appeals where the appeal was decided within ninety days from journalization of the appellate judgment unless the applicant shows good cause for filing at a later time." App. R. 26(B)(1).  The judgment affirming Mr. Jefferson's conviction was

53

journalized on September 29, 2022.  (ECF Doc. 9-1, p. 14.)  Mr. Jefferson missed this deadline and filed a motion for leave to file a motion for reopening under App. R. 26(B) on January 11, 2023.  (*Id*. at pp. 187-96.)  The state appellate court denied the motion, finding that Mr. Jefferson failed to show good cause for the delay.  (*Id*. at pp. 208-11.)  Thus, the evidence establishes that the first two prongs of the *Maupin* analysis have been met.

The third prong of the *Maupin* analysis asks whether the procedural rules establish an adequate and independent state law ground by which the claims may be procedurally defaulted.  *See* 785 F.2d at 138.  The Sixth Circuit had held that "the failure to timely file a Rule 26(B) application constitutes an adequate and independent state ground for barring habeas relief[.]"  *Hedenberg v. Noble*, No. 19-4250, 2020 WL 3422167, at *4 (6th Cir. June 15, 2020) (citing *Scuba v Brigano*, 527 F.3d 479, 488 (6th Cir. 2007)).  Thus, the third prong of the *Maupin* analysis has also been met.

Under the fourth prong of the *Maupin* analysis, the final question is whether Mr. Jefferson has shown "cause and prejudice" or a fundamental miscarriage of justice to excuse his procedural default on Ground Five of the Petition.  "'[C]ause' under the cause and prejudice test must be something *external* to the petitioner, something that cannot fairly be attributed to him[.]"  *Coleman*, 501 U.S. at 753 (emphasis in original) (discussing *Murray*, 477 U.S. at 488).

Here, Mr. Jefferson asserts that the "interference and inaction" of prison staff in connection with his untimely App.R. 26(B) application amounted to "cause" sufficient to excuse his procedural default.  (ECF Doc. 13, pp. 13-18.)  In support, he makes the following assertions: he received the appellate court's September 29, 2022 decision in October 2022; he started working on his application to reopen on November 24, 2022, after his security level was reduced and he was transferred to Richland Correctional Institution in November 2022; he completed his

54

application to reopen on December 19, 2022; and he submitted a print off sheet to the librarian on December 20, 2022, but was delayed in getting the application reviewed and printed because the librarian went on vacation without notification to inmates from December 21 through 28, 2022, "making it impossible for [him] to print off his motion to reopen in order to mail his App. R. 26(B) motion in a timely manner." (ECF Doc. 13, pp. 13-18.) Mr. Jefferson asserts that he did not receive his application back from the librarian until December 30, 2022, after she returned and reviewed his legal documents, and that he placed his motion for leave to file the application in the prison mailbox that same day. (*Id*. at p. 14.) He therefore argues that his procedural default should be excused because prison library rules and the librarian's absence prevented him from timely printing and mailing his application. (*Id*. at pp. 13-15, 17.)

In the Sixth Circuit, "courts have held repeatedly that a petitioner's pro se status, limited access to a prison law library, or ignorance of the law and state procedural rules do not constitute cause sufficient to excuse a procedural default." *Suggs v. McConahay*, No. 21-3281, 2021 WL 10161588, at *3 (6th Cir. Sept. 9, 2021) (citing *Bonilla v. Hurley*, 370 F.3d 494, 498 (6th Cir. 2004) and *Hannah v. Conley*, 49 F.3d 1193, 1197 (6th Cir. 1995)). In *Suggs*, the petitioner asserted that he was only able to go to the law library on March 25, and did not have access again until April 13, one day before the relevant filing was due. *See* 2021 WL 10161588, at *3. The Sixth Circuit nevertheless found he had failed to demonstrate "cause" to excuse his default because "he at least had access on March 25," the information he needed for the filing "was available . . . from his direct appeal," and he "'d[id] not indicate why he required additional time to conduct legal research and how his limited law library time prevented him from filing' the memorandum." *Id.* (quoting *Bonilla*, 370 F.3d at 498).

Here too, the evidence and circumstances before the Court do not support a finding of "cause" to excuse Mr. Jefferson's procedural default.  The only evidence Mr. Jefferson provides in support of the described impediments is his own self-serving statement, which is inconsistent with the statement he made to the state courts.  (*Compare* ECF Doc. 13, p. 14 (asserting librarian was unavailable from December 21 through December 28, 2022, due to an unannounced vacation) *with* ECF Doc. 9-1, p. 187 (asserting librarian was unavailable from December 23 through December 28).)[15]  Further, as the state court noted, Mr. Jefferson's complaints regarding limited access to the law librarian only accounts for the last week or two of a three month time period allotted for Mr. Jefferson to prepare and file his App.R. 26(B) application.  Even giving credence to his assertion that he did not receive the appellate court's decision until October 2022, he does not explain: why he did not begin working on his application until November 24; why he waited until after his transfer and reduction in security level before working on the application; and why he did not complete the application until December 19.  Like other courts, the undersigned concludes that the described limitations in Mr. Jefferson's access to the law library and/or law librarian during the winter holiday season are insufficient to establish "cause" to excuse his default when he had nearly three months prior to that time to work on the application.

Mr. Jefferson's argument that the state court addressed the merits of his claim in Ground Five (ECF Doc. 13, pp. 15-16) does not change this analysis.  First, a review of the state court's decision reveals that the court did not decide the claim on its merits, but rather briefly addressed the merits in support of its finding that Mr. Jefferson did not demonstrate good cause for his late filing.  Specifically, the court of appeals highlighted the fact that the basis for the assignment of error was "evident" to Mr. Jefferson "at or before the day before he was convicted" because that

---

[15] If Mr. Jefferson's representations to the state court are believed, a librarian was available to assist Mr. Jefferson for two days after December 20—the day he contends he provided the librarian with a print off sheet.

fact "undermined his argument that he ha[d] shown good cause for the delay." (ECF Doc. 9-1, pp. 209-10.) In other words, no part of the 90-day period for filing needed to be spent learning the facts to support the claim because it was evident from the day of his conviction. Second, "the adequate-and-independent-state-ground doctrine, '[b]y its very definition ... requires the federal court to honor a state holding that is a sufficient basis for the state court's judgment, even when the state court also relies on federal law.'" *Conley v. Warden Chillicothe Corr. Inst.*, 505 F. App'x 501, 507 (6th Cir. 2012) (quoting *Harris v. Reed,* 489 U.S. 255, 264 n. 10 (1989) (alterations in original)). Thus, Mr. Jefferson's procedural default would not be negated or excused even if the state court of appeals had reached the merits of Mr. Jefferson's App. R. 26(B) assignments of error because the state court enforced a procedural bar. *See e.g.*, *Miller v. Rogers*, 121 F.3d 708 (6th Cir. 1997) (explaining that "[w]hen a state court invokes a procedural bar and also discusses the merits of the issues raised[,] federal courts are barred from deciding the merits of the claims") (citing *See Ewing v. McMackin,* 799 F.2d 1143, 1149 (6th Cir. 1986)).

Because Mr. Jefferson has not shown "cause" to excuse his procedural default, this Court need not assess the question of "prejudice." *See Smith v. Murray,* 477 U.S. 527, 533 (1986). The undersigned therefore turns to whether Mr. Jefferson's procedural default may be excused based on a fundamental miscarriage of justice.

"A fundamental miscarriage of justice results from the conviction of one who is 'actually innocent.'" *Lundgren*, 440 F.3d at 764 (quoting *Murray*, 477 U.S. at 496). For a claim of actual innocence to be credible in this context, a petitioner must "support his allegations of constitutional error with new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial." *Schlup v. Delo*, 513 U.S. 298, 324 (1995). He must further "show that it is more likely than not

that no reasonable juror would have convicted him in the light of the new evidence." *Id.* at 327. This standard is intended to permit petitioners with "truly extraordinary" cases a "meaningful avenue by which to avoid a manifest injustice." *Id.* (internal quotations omitted).  Importantly, "'actual innocence' means factual innocence, not mere legal insufficiency." *Bousley v. United States*, 523 U.S. 614, 623 (1998).

Here, Mr. Jefferson does not advance a specific actual innocence argument, and certainly does not identify or provide new reliable evidence that might support a claim that he is actually innocent.  (ECF Doc. 13, p. 18 (arguing only "cause" and "prejudice").)  Indeed, he does not deny shooting the victims.  And he cannot overcome procedural default by asserting innocence based on a claim that acted in self-defense because "a claim of self-defense is a claim of legal innocence, not factual innocence." *See Valentin v. Woods*, No. 19-CV-11068, 2023 WL 415152, at *14 (E.D. Mich. Jan. 25, 2023) (citing *See Bacon v. Klee*, No. 15-2491, 2016 WL 7009108, at *8 (6th Cir. Nov. 30, 2016); *Harvey v. Jones*, 179 F. App'x 294, 298-99 (6th Cir. 2006); *Bushner v. Bracy*, No. 17-3553, 2017 WL 9480312, at *3 (6th Cir. Dec. 11, 2017)).  Accordingly, the undersigned concludes that Mr. Jefferson has not shown that a failure to consider the merits of his procedurally defaulted claim would result in a fundamental miscarriage of justice.

For the reasons set forth above, the undersigned concludes that Ground Five is procedurally defaulted, that Mr. Jefferson has not established cause and prejudice to excuse the procedural default, and that he has not shown a fundamental miscarriage of justice to excuse the default.  For all of the reasons set forth above, the undersigned recommends that the Court **DISMISS** Ground Five based on procedural default.

**F.      Ground Six Is Not Cognizable and/or Without Merit**

In Ground Six, Mr. Jefferson argues that the state appellate court denied his constitutional rights to procedural due process and equal protection when it denied his application to reopen his appeal under Ohio App. R. 26(B).  (ECF Doc. 1, pp. 27-30; ECF Doc. 13, pp. 36-39.)  Specifically, he asserts that his rights were violated because the state court of appeals "applied the strict standards of App. R. 5(A) versus flexible standards pursuant to App. R. 26(B)(2)(b)" when concluding that he failed to demonstrate good cause for not filing his application to reopen within ninety days from the journalization of the appellate court's judgment.  (ECF Doc. 1, p. 29; *see also* ECF Doc. 13, p. 38.)  He also argues that the denial of his application to reopen "resulted in a decision that was an unreasonable application of clearly federal law of the equal protection of the law."  (ECF Doc. 13, p. 39; *see also* ECF Doc. 1, pp. 29.)  In response, Respondent argues that Mr. Jefferson has failed to present a valid due process or equal protection claim in Ground Six.  (ECF Doc. 9, pp. 49-52.)  For the reasons explained below, the undersigned concludes that Ground Six is not cognizable and/or without merit.

An application to reopen under App. R. 26(B) is "a collateral post-conviction remedy and not a direct appeal." *Lopez v. Wilson*, 426 F.3d 339, 353 (6th Cir. 2005); *Morgan v. Eads*, 104 Ohio St. 3d 142, 147 (2004) ("[W]e continue to adhere to the position that the App.R. 26(B) process represents a collateral postconviction remedy and is not part of the original appeal."). "[T]he Sixth Circuit has consistently held that errors in post-conviction proceedings are outside the scope of federal habeas corpus review." *See Cress v. Palmer*, 484 F.3d 844, 853 (6th Cir. 2007) (citing *Kirby v. Dutton,* 794 F.2d 245, 246-47 (6th Cir. 1986); *Roe v. Baker,* 316 F.3d 557, 571 (6th Cir. 2002)).  Further, the Sixth Circuit has held that habeas corpus "is not the proper means by which prisoners should challenge errors or deficiencies in state post-conviction

59

proceedings . . . because the claims address collateral matters and not the underlying state conviction giving rise to the prisoner's incarceration." *Kirby*, 794 F.2d at 247; *id*. at 248 (explaining that although, "the result of the habeas petition need not necessarily be reversal of the conviction . . . the petition must directly dispute the fact or duration of the confinement") (citing *Preiser v. Rodriguez,* 411 U.S. 475, 500 (1973)); *see also Cress*, 484 F.3d at 853.

Mr. Jefferson's claim that he is entitled to federal habeas relief based on the standard the state court of appeals applied under state law in a collateral post-conviction proceeding addresses a collateral procedural matter, not Mr. Jefferson's underlying conviction. Accordingly, the undersigned finds the claim not cognizable. *Cress*, 484 F.3d at 853; *Kirby*, 794 F.2d at 246-47, 248; *see also Wallace v. May*, No. 4:22-CV-1141, 2024 WL 2159996, at \*5 (N.D. Ohio Apr. 12, 2024), *report and recommendation adopted*, No. 4:22 CV 1141, 2024 WL 2155940 (N.D. Ohio May 14, 2024) (finding petitioner's "challenge[] [to] the Ohio court of appeals' process for ruling on his Rule 26(B) application to reopen . . . not cognizable"). Mr. Jefferson's claim is also not cognizable on federal habeas review because it addresses a matter of state law—here, the application of the Ohio rules of appellate procedure—and "it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions." *See Estelle*, 502 U.S. at 68. Accordingly, the undersigned recommends that the Court **DENY** Ground Six as not cognizable on federal habeas review.

Even if Ground Six were construed to allege a federal constitutional violation, Mr. Jefferson has failed to establish that the state appellate court's denial of his motion for leave to reopen his appeal was contrary to or an unreasonable application of clearly established federal law. The only Supreme Court case cited by Mr. Jefferson in connection with this claim is *Vill. of*

60

*Willowbrook v. Olech*, 528 U.S. 562, 564 (2000).[16]  (ECF Doc. 1, p. 29; ECF Doc. 13, p. 39.)

Citing *Willowbrook*, he argues the state court's denial of his motion for leave to file an untimely

App. R. 26(B) application was an unreasonable application of clearly established federal law.

(*Id.*)  The Supreme Court in *Willowbrook* held that a claim was stated under the equal protection

clause, even if it was brought by "a 'class of one,'" when the claim alleged that the individual

was intentionally treated differently from other similarly situated people without a rational basis

for the different treatment.  528 U.S. at 564-65.  Mr. Jefferson does not explain how the holding

in *Willowbrook* supports a finding that the denial of his request to file an untimely App.R. 26(B)

application violated his rights under the equal protection clause, and therefore has not shown that

the state court's decision was contrary to or an unreasonable application of clearly established

federal law.  Accordingly, even if Mr. Jefferson sufficiently alleged a federal constitutional claim

in Ground Six, the undersigned recommends that the Court **DENY** the claim on the merits.

For the reasons set forth above, the undersigned recommends that the Court **DENY**

Ground Six as not cognizable on federal habeas review and/or as without merit.

---

[16] Mr. Jefferson's citation contains a typographical error.  He cites to *Willowbrook,* 528 U.S. 462 (*see* ECF Doc. 1, p. 29; ECF Doc. 13, p. 39), but the correct citation is 528 U.S. 562.

## V. Order and Recommendation

For the reasons set forth above, the undersigned **DENIES** Petitioner's motion for appointment. (ECF Doc. 16). Further, the undersigned recommends that the Court **DENY** and/or **DISMISS** the Petition (ECF Doc. 1) as follows: **DENY** Grounds One through Three on the merits; **DENY** Ground Four as not cognizable on federal habeas review and/or on the merits; **DISMISS** Ground Five as procedurally defaulted; and **DENY** Ground Six as not cognizable on federal habeas review and/or on the merits.

Date: June 17, 2026

/s/ Amanda M. Knapp

AMANDA M. KNAPP
UNITED STATES MAGISTRATE JUDGE

## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document. Failure to file objections within the specified time may forfeit the right to appeal the District Court's order. *See Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019); *see also Thomas v. Arn*, 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed. 2d 435 (1985).